IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 26, 2018 Session

## STATE OF TENNESSEE v. BARBARA MAE POTTER

**Appeal from the Criminal Court for Washington County**
**No. 39553A   Jon Kerry Blackwood, Senior Judge**

———————————————————

**No. E2015-02262-CCA-R3-CD**

———————————————————

Following a trial, a Washington County jury found Defendant, Barbara Mae Potter, guilty of two counts of first degree premeditated murder, one count of conspiracy to commit first degree murder, and one count of tampering with evidence.  At sentencing, the trial court merged Defendant's conviction for conspiracy to commit first degree murder into the two convictions for first degree premeditated murder and imposed concurrent life sentences for those offenses.  The trial court imposed a three-year sentence for tampering with evidence and ordered the sentence to run concurrently with Defendant's life sentences.  On appeal, Defendant contends that: (1) the trial court erred in changing the venue of the trial to Washington County; (2) the trial court erred in denying Defendant's motion for the lead prosecutor to withdraw from the case; (3) the trial court erred in denying Defendant's "motion to pre-emptively strike witness"; (4) the evidence is insufficient to support her convictions; (5) the trial court erred in denying Defendant's motion to sever; and (6) issues raised in Defendant's petition for writ of error coram nobis entitle her to a new trial.  Following a thorough review, we reinstate Defendant's conspiracy to commit first degree murder conviction, affirm the convictions, and remand for sentencing on conspiracy to commit first degree premeditated murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
in Part and Reversed in Part; Case Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

H. Randolph Fallin and Tate Davis, Mountain City, Tennessee, for the appellant, Barbara Mae Potter.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Tony Clark, District Attorney General; and Dennis Brooks and

Matthew Roark, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

This case involves the murders of two victims, Billy Clay Payne ("Victim Payne") and Billie Jean Hayworth ("Victim Hayworth"), whose bodies were found inside their Mountain City home that they shared with their infant son and Victim Payne's father, "Paw Bill," on January 31, 2012. The Johnson County Grand Jury[1] indicted Marvin E. "Buddy" Potter, Jr., ("Buddy"),[2] Barbara Mae Potter ("Defendant"), Jenelle Leigh Potter ("Jenelle") (collectively, "the Potters"), and Jamie Curd ("Jamie") for these crimes. Buddy was tried and convicted in October 2013 of two counts of first degree premeditated murder and was sentenced to serve two consecutive life sentences; Jamie pled guilty to two counts of facilitation of first degree murder and received concurrent twenty-five year sentences as part of a plea agreement with the State; and Defendant and Jenelle were tried jointly in May 2015. The following is a summary of the evidence presented at that trial.

*State's Proof*

### Discovery of the Victims

On the morning of January 31, 2012, Brad Osborne arrived at the victims' residence around 6:30 a.m. to pick up Victim Payne for work. The two men worked at a textile plant in Mountain City, Parkdale Mills, and routinely rode to work together. When Mr. Osborne arrived, Paw Bill had already left for work. Mr. Osborne waited a few minutes, noting that the victims' shared bedroom light was illuminated. When Victim Payne did not exit the house within a few minutes as he normally did, Mr. Osborne attempted to call Victim Payne on his cell phone. Due to a disruption in Mr. Osborne's cell phone service, however, he was unable to connect to Victim Payne's phone.

---

[1] As explained below, the case was tried in Washington County after the trial court granted Defendant's motion for change of venue.

[2] Because three of the co-defendants share a last name, we will refer to all co-defendants by their first names. No disrespect is intended.

Mr. Osborne exited his vehicle and walked around the side of the house to the rear sliding glass door, which was "seldom" locked. Mr. Osborne knocked on the sliding glass door and entered the residence. Inside, he heard an alarm clock ringing. From the living room, Mr. Osborne called out to Victim Payne numerous times with no response. He then used the house phone to call Victim Payne's cell phone, but he did not hear Victim Payne's cell phone ringing. As Mr. Osborne turned to leave, he again called out to Victim Payne. Upon receiving no response, Mr. Osborne left the house and drove to work alone.

Around 10:00 a.m. that morning, Roy Stephens, the victims' former neighbor, went to the victims' residence to pick up his mail, which the victims kept for him on a shelf in the living room. Mr. Stephens noticed that Victim Payne's and Victim Hayworth's vehicles were at the residence, so he knocked and entered the unlocked sliding glass door at the back of the home. Once inside, Mr. Stephens "holler[ed]" but received no response. He continued to call out as he walked down the hallway toward the bedrooms. When he looked into the first bedroom, he found Victim Payne lying on his back on the bed. Mr. Stephens saw blood near the doorway and blood on Victim Payne's neck. He "hollered at [Victim Payne][,] approached him, and grabbed him by the arms to see if he would respond[.]" When Victim Payne did not respond, Mr. Stephens ran out of the house and told his wife to call 911 because Victim Payne was dead. Linda Stephens was trained in CPR, so she entered the residence to attempt to provide aid to the victim. She found Victim Payne "very stiff and ice cold[,]" and his face looked as if he had been beaten. When she attempted to find a pulse in Victim Payne's neck, Mrs. Stephens realized that his throat had been cut. Mrs. Stephens used a phone in the living room to call 911.

While his wife was speaking with the 911 operator, Mr. Stephens heard a noise coming from a second bedroom. When he entered the bedroom, he found Victim Hayworth lying on the floor, holding her seven-month-old baby in her arms. Mr. Stephens noticed that the baby was breathing and appeared to be asleep. However, Victim Hayworth was not breathing, and Mr. Stephens could "see a hole in her head." Not finding any injuries to the baby, Mrs. Stephens checked Victim Hayworth for a pulse. Victim Hayworth was lying with "a pool of blood at the top of her head[,]" and Mrs. Stephens observed "fragments of [Victim Hayworth's] hair and stuff on the carpet." Victim Hayworth had no pulse and was clearly deceased.

As part of the investigation into the victims' deaths, an autopsy of both victims was conducted. The medical examiner who performed the autopsies determined that both victims suffered a gunshot wound to the head and that Victim Payne also suffered deep "slash wounds" to his neck. The medical examiner concluded that Victim Payne's cause of death was a "[g]unshot wound of the head and sharp force injuries of the neck" and

- 3 -

that the manner of death was homicide. Further, the medical examiner opined that Victim Hayworth's cause of death was a gunshot wound to the head and that the manner of death was homicide.

Chief Deputy Joe Woodard of the Johnson County Sheriff's Department and Special Agent Scott Lott of the Tennessee Bureau of Investigation ("TBI") were assigned to investigate the murders. In speaking with many of the victims' friends and family members, Chief Deputy Woodard and Agent Lott learned that the victims' only known "enemies" were the Potters. Through their investigation, Chief Deputy Woodard and Agent Lott began to see a connection between social media activity and the development of hostility between the victims and the Potters, which escalated over the months leading up to the murders.

**The Potters**

The Potters moved to Mountain City from Pennsylvania in 2004. Christine Groover, Buddy and Defendant's elder daughter, recalled that Buddy joined the Marines at the age of eighteen and claimed to have worked for the CIA during the Vietnam War. He suffered a back injury around the time of Ms. Groover's birth and, as a result, was no longer able to work or remain in the Marines. He and Defendant raised Ms. Groover and their younger daughter, Jenelle, in Pennsylvania, about forty minutes west of Philadelphia. Jenelle graduated from high school and could read and write, but she had some learning difficulties. Ms. Groover noted that Jenelle had been "a little bit slower in learning and in developmental capacity" and that her reasoning and interaction with other people had always been "a little odd." Ms. Groover believed that Jenelle was "coddled" by Buddy and Defendant and that they always took care of any issues she faced. Ms. Groover did not believe that Jenelle's disabilities were "as bad as everybody else said they were." Ms. Groover had witnessed Jenelle manipulate and deceive others, and therefore, she knew what Jenelle was "capable of." Ms. Groover explained that she moved to Mountain City in 2009 to help care for Defendant's mother. Ms. Groover lived with her grandmother for a year and two months. Due to problems with Defendant and Jenelle during this time period, Ms. Groover had to seek an order of protection against them.

**Online Feud**

In 2009, Jenelle met Tracy Greenwell, Victim Payne's sister, at a grocery store in Mountain City. Following their initial meeting, Ms. Greenwell befriended Jenelle, and they began speaking by phone often. Ms. Greenwell also began inviting Jenelle to accompany her on various outings. However, before being allowed to take Jenelle anywhere, Ms. Greenwell had to go over to the Potter residence on Hospital Road "a

couple of times" so that Defendant and Buddy could get to know her. On one outing, Jenelle accompanied Ms. Greenwell, Victim Payne, and a group of friends rock climbing. Jenelle and Ms. Greenwell later attended a party thrown by Victim Payne at the victims' residence. Ms. Greenwell and Victim Payne decided to "set up" Jenelle with their second cousin, Jamie Curd, because Jenelle did not have a boyfriend and Jamie did not have a girlfriend.

In 2010, Victim Payne began dating Victim Hayworth, and their relationship quickly became serious. Around the same time, someone began posting negative comments about Victim Payne, Victim Hayworth, and their friends on Facebook and on the Mountain City page of the website "Topix."[3] The State submitted several portions of Topix postings related to this case. "Matt Potter" wrote the initial post, calling Victim Hayworth and her two friends, Lindsey Thomas and Tara Osborne, "no good whores" and accusing the women of selling drugs. "Matt Potter" then made numerous threats of violence against the women. An unidentified person posting as "Kelly" responded in support of "Matt's" accusations and threats, adding that Ms. Thomas had HIV and offering support to Jenelle. "Matt Potter" then posted again, demanding that Ms. Thomas stop harassing Jenelle and issuing threats of violence in retaliation. The postings on Topix regarding the victims and Ms. Thomas continued as follows:

Thursday Apr 21

Dan White AOL: Wow Matt and Kelly. I new she was bad but I had no clue she was off on the deep[ ]end. She is crazy that's for sure. Sounds like all of them are. I know [Victim Hayworth] that B**ch has lived with more guys and have sex with 80% of Mtn City and [Ms. Thomas] [I] would say Half of Mtn city[.] Then you Trade and Butler and then you have Doe and then Johnson City and then Kings port she has been all over and she does have HIV this is all around town. [A]nd [Mrs. Osborne] she will give it to anyone her poor Husband he's a nice guy but he never wants to be home with her. I think when his baby is 18 he will leave her dumb ass too. She is a whore too. I agree with you both. [A]nd this girl Jenelle I do know as in Passing but she is a good girl and was brought up right you can tell everything is your welcome and Hello and thank you and she just a sweet girl. I will be praying for Jenelle. As far as the other ones go there no good whore sluts and that is carrying something and giving it to

---

[3] At trial, witnesses testified that Topix was a nationwide gossip website; that Mountain City had its own page on the site, and that individuals could use other people's identities or make up names when posting messages on Topix.

everyone.  Damn girls.  They live in high school still and they need to grow up.

.  .  .  .

Thursday Apr 21

Matt Potter AOL:      .  .  . [Jenelle] is a sweet person and ppl try to get her. But she has alot of us behind her if she know's us or not.  But Her Dad is Big time and he will deal with the rest of this sh*t.  There F**king whores and thats all this town is and Drugs.  I know for sure [Victim Hayworth] and [Ms. Thomas] did drugs together and i know [Ms. Thomas] does Meth she get's off Jason.  I know w[a]y to much lol.  I love that Jenelle is not like them she stayed sweet .  .  .  . they are dumb a** holes.  mother f**kers get what's comeing there way.  and they dont know who i am.

Friday Apr 22

Matt Potter AOL:      Well [I] guess [Victim Payne] dont know that have his Number and his phone is being taped.  Ha [I] know what he said about Jenelle and it was wrong.  He's a f**king work when these's girls are doing this to Jenelle we got our stuff and Jenelle I'm sure has stuff too.  I'm going to be posting numbers if they dont stop buging Jenelle.  And then all kind's of ppl will be calling them.  I have cell's to home phone numbers.  and f**king [Victim Hayworth] is geting so fat with that baby she looks like a chipmonk thats eating to many nuts LOL.  I hope she lose's that baby in time.  It dont need a mother like [Victim Hayworth] and [Victim Payne] he's no father by the way he acts and talks.  Sooner thy move out of town the better.  I think something about geting a house.  I hope he cant get it.  I hope they have to live out in the woods.  More better for chipmonk, she cant make friends out there and f**k deer and bear and whatever else.  I hope a bear would eat her but the way she looks it would go runing the other way LOL.  Ugly a** B**ch whore.  Cant leave no one alone.  Drugie whore a** B**ch.  Go f**k a damn tree for all i care.  Leave Jenelle alone.

Victim Payne printed out copies of these negative posts and placed them into a binder.  He showed Ms. Greenwell some of the material he collected, prompting Ms. Greenwell to post the following message to Jenelle on Facebook in late November 2010, "[Y]our friend Matt needs to leave Billie Jean and [Ms. Thomas] off of the Topix website.  You lost my brother as a friend and I'm not happy with you either."  Jenelle responded to Ms. Greenwell's message by denying that she had posted negative

comments about the victims. Jenelle claimed that she did not know who "Matt Potter" was, that she had done nothing wrong, and that there had been "a lot of trash talking about [Jenelle] in town from both of them . . . ." In a further response, Jenelle told Ms. Greenwell:

> They need to back off. I don't talk to them and don't know them. Why don't you tell them to get away from me and tell them do not pull in my driveway. Dad is getting a little sick of it. He has gone with me to the cops and I showed them and gave names and they looked everything up and they also know that I'm not doing a thing. So, this is not my fault. If you hate me then I don't care.

One of Victim Hayworth's friends mentioned in the Topix postings, Tara Osborne, met Jenelle at a grocery store in the fall of 2010. After meeting Jenelle, Mrs. Osborne received a friend request on Facebook from her, which Mrs. Osborne accepted. However, Mrs. Osborne grew tired of the "negativity" Jenelle created on Facebook and the frequency of Jenelle's "messaging" to her. In September, Mrs. Osborne sent Jenelle a private message on Facebook, in which Mrs. Osborne apologized to Jenelle for not responding to instant chat messages and explained that she had problems with her computer. Mrs. Osborne received the following response from Jenelle's Facebook account:

> [H]ey, sweetie, it's really okay. I understand. I hope you all are doing well. I thank you for taking the time to write me. I hope you get it all worked out and everything. I'm not sad, or mad, or anything with you, honey. I can understand. It's okay. I'm doing okay. My health is not well and things I'm trying to fix and let people go and just leave me alone, but, I think that it is too much to ask for, laugh out loud. If they don't stop talking and putting me down[,] I'm going to end up saying what I['m] really think[ing] and how mad . . . I really am and see how they like it. I have not done anything to anyone and I s[t]ay to myself [and] talk to friends[.] [But] they go overboard and they [are] just . . . mean girls, really. I hate they talk about me and I hate they act like they do -- anything to anyone to get away with it. It's sad. Well, anyways, I hope you are doing well. I'm praying and thinking of you all. Take care and God bless, Jenelle.

To try to alleviate Jenelle's constant messaging, Mrs. Osborne altered her Facebook page so that it did not indicate when she was logged into her Facebook account. When that did not resolve the issue, Mrs. Osborne removed Jenelle as a friend from her Facebook account.

Then, on February 6, 2011, Mrs. Osborne received a message from Jenelle's Facebook account, which read:

I'm not sure what I did, but I have not done anything. I'm not sure why you took me off your friends but I'd like to know why. We . . . have never had any issues.

Mrs. Osborne responded:

[H]ey, it's not anything that you have done. I'm making my Facebook close friends and family and did not see the point in having people as friends if I did not talk to them. Don't take it to heart, I don't mean anything by it.

Mrs. Osborne received the following response from Jenelle's Facebook account:

Oh, okay, that's fine, sweetie. I was making sure I did not think . . . I did anything wrong at all. I just did[n't] understand[.] [T]hat is great and fine and I can understand. Thank you for getting back to me. I took a lot [off] . . . mine, too. But, it was for the best. Thank you for getting back to me. You're so sweet. Take care, God bless, Jenelle.

Following this interaction, Mrs. Osborne received another message from Jenelle through Facebook, accusing Mrs. Osborne of "harassment, the phone calls, [and] messing with [Jenelle's] mailbox." In response, Mrs. Osborne called Jenelle and denied all of her accusations. She further told Jenelle the "truth" about why she had "defriended" her. Mrs. Osborne told Jenelle that she "was tired of [her] drama and her bull crap that [Jenelle] was posting about everybody else knowing that it was not true." Jenelle told Mrs. Osborne to "leave [her] alone," claiming Mrs. Osborne was affecting her health.

Following this exchange, Mrs. Osborne received several more phone calls from or related to Jenelle. One such call, in March or April 2011, was from a male caller using a voice disguiser. The caller told Mrs. Osborne that she needed to leave Jenelle alone and stop "the harassment, the phone calls, the vandalism, [and] the stalking." Mrs. Osborne denied that she had participated in any of the conduct the caller accused her of and told the caller that she would be "taking this" to the sheriff's department. The following day, Mrs. Osborne went to the Johnson County Sheriff's Department and was directed to "Safe Haven," where she filed for an order of protection. The order was later dismissed, however, because of a lack of the statutorily-required relationship between the parties.

Another friend of Victim Hayworth, Lyndsey Potter,[4] had a similar negative interaction with Jenelle on Facebook. Ms. Potter became Facebook friends with Jenelle in 2011. Initially, Jenelle would "like" or comment on Ms. Potter's "status updates" and pictures. However, at one point, Jenelle posted a photograph of Victim Hayworth she had taken from another Facebook account and "said some nasty things." Ms. Potter asked Jenelle to remove the post because it was "inappropriate." Jenelle complied and removed the post and did not initiate any contact with Ms. Potter "for a while." However, several months later, in the summer of 2011, Jenelle sent Ms. Potter a private message, which read as follows:

> I'm not trying to be mean, but your so called friends are still coming after me and I'm never alone, and they have done a lot to my house and to my family, and I'm not mean but I'm getting there. I put that pic of them on once for a few friends to see who they were and I took it down. Do I think they are mean? Yes. Do I think you are fooled? Yes. You need to be careful who you're friends with. Maybe it's not because I'm from here, but I'm sick of this crap and it needs to stop. They need to grow up and live their life like I'm living mine. I'm sick and in the hospital more than I'm at home and they need to stop. I hope you don't think I'm being mean, but it's about time I take up for myself and say what I think for once. I've never done that, wow. I'm 30 and I act more grown up than most people. I have been through too much to let them get to me.

Ms. Potter responded to the message, stating:

> Sorry that you're sick, but have you actually seen them doing this, or are you just assuming 'cause you want it to be them? I honestly don't believe that they're bothering you. They have much better things to do than to worry about you. [Victim Hayworth] just had a baby, so, why in the hell would she be so out to get you? I think the best thing for you to do is to drop it, keep your mouth shut and move on. If they are bothering you then they'll see it isn't working and they'll quit.

Jenelle then responded:

> Hi, Lyndsey. No, I know what they are doing and I know other people that have seen it, too. But, I was not going to write you back, but what made me so mad is you think I want to be like them. Yes, a whore and living with guys and sleeping around and drinking and smoking, yeah, right. I

---

[4] Ms. Potter testified that she was not related to the Potter family charged in these offenses.

love who I am and I have a good life.  I'm 30 years old.  They can't grow up and they don't even have jobs and they lie . . . and I am so not like that.  I don't care that she had her baby.  I feel bad for it, a mother like her.  I hope maybe it can go to a better home, but the thing is like I say, I know . . . who I am and I love who I am and I'm not from here and I'm smart.  People down here never seem to do anything with their lives other than pick and, excuse me, hurt people.  I'm not like that.  I'm a nice girl and I'm doing the best I can.  My health is no one's [ ] business, I guess.  But, yes, it's . . . bad but I'm grateful for every day that God gives me, so, maybe you should think before you talk.

Ms. Potter replied:

You don't seem very smart to me, but that's my opinion and to each their own.  No one is perfect and I'm positive you're definitely not.  My advice to you really is to drop it.  And you say you're 30 years old, this doesn't seem like a smart 30 year old behavior to me, smart one.

In a final message, Jenelle replied:

Well, I think they really need to stop their damn games.  As far as me being smart it's kind of funny, I got 4.0 out of high school and I'm still smarter than you girls.  I don't like you anymore.  I thought you were nice, but you are not.  And, wow, you're dumb for everything is right in front of you.  Let me guess, you do drugs with them.  Well, I will block you and I will never talk to you ever again.  I think you are no good.  Rich whores is what you three are and you need to get over yourselves.

There was no further communication between the two.

Victim Hayworth's best friend, Lindsey Thomas, also received a Facebook friend request from Jenelle in 2011.  Ms. Thomas accepted the friend request but quickly realized that Jenelle was posting negative comments about both her and Victim Hayworth.  Initially, the postings stated that the two women were "mean" but escalated from there, and Jenelle also began sending private messages to Ms. Thomas.  In the private messages, Jenelle continued to assert that Ms. Thomas and Victim Hayworth were "mean" and that Jenelle "wished" they would leave her alone.

Ms. Thomas called Jenelle and asked her "to please quit writing stuff" online about her.  After this phone call, Jenelle began to repeatedly call Ms. Thomas.  At first, it was a few phone calls, but it escalated to fifteen to twenty times a day.  During some of

the phone calls, Jenelle would tell Ms. Thomas to leave her alone, but during other calls, Jenelle would just breathe into the phone and not speak. Ms. Thomas knew it was Jenelle because Jenelle's home phone number would be displayed on Ms. Thomas's cell phone. Ultimately, Ms. Thomas grew tired of Jenelle's Facebook postings and phone calls, and she filed a phone harassment charge against her in the Johnson County General Sessions Court.

While Ms. Thomas's phone harassment charge against Jenelle was pending, Victim Hayworth was pumping gas at a convenience store when she was confronted by Defendant and Jenelle. Defendant and Jenelle blocked Victim Hayworth's car by positioning their car at the bumper of Victim Hayworth's vehicle. Defendant and Jenelle screamed at Victim Hayworth and told her that she did not deserve to be a mother and that she should not have been "given a child." Bystanders saw that Victim Hayworth was crying and "visibly shaken" and offered to call the police. However, Defendant and Jenelle left the parking lot and "went up the road" towards Mountain City.

Victim Hayworth later testified against Jenelle when Ms. Thomas's phone harassment charge was tried in general sessions court on November 30, 2011. However, the general sessions judge dismissed the case. After court, Buddy, Defendant, Jenelle, and Jamie—who had attended court with the Potters—went to a convenience store located near the victims' residence to have lunch. While they were eating, Victim Hayworth and Mrs. Osborne came into the store and then walked out. When the Potters and Jamie exited the store, Victim Payne pulled up in the parking lot. Victim Payne got out of his car and began angrily "hollering" at the Potters. As Victim Payne and Buddy "holler[ed] and yell[ed]" at one another, Jamie left the scene.

### Jamie Curd and "Chris"

Jamie was in his mid-thirties and lived on Pleasant Valley Road in Johnson County with his mother when he first met the Potters. He worked at Parkdale Mills with Victim Payne and Victim Hayworth, and Victim Payne introduced Jamie to the Potters in late 2009. Days after meeting Jamie, Jenelle asked Victim Payne for Jamie's phone number. After being provided with Jamie's home phone number, Jenelle began calling him in short, thirty to forty-five-second phone calls. Jenelle explained that she could not speak longer because she did not want her parents to know that she was calling him. During one phone call, Jenelle told Jamie that her computer was "messing up[,]" so Jamie went to the Potter residence to work on their computer. Jamie noted that Defendant and Jenelle used the computer but that Buddy did not. Although he occasionally "worked on people's computers[,]" Jamie had no specialized computer training. Over the course of several visits to the Potter residence, Jamie performed a disk clean-up on their computer

and eventually reformatted it. While he worked on the computer, Jenelle would sit and talk with him in the computer room.

Jamie eventually purchased Jenelle a prepaid cell phone so that he and Jenelle could talk without her parents' knowledge. Jenelle instructed Jamie to hide the cell phone in a bush at the corner of her front yard where she could retrieve it. Jenelle used this cell phone to call him until Defendant discovered the cell phone and sent Jamie a text message letting him know that she had the phone. Jamie then purchased a second prepaid cell phone for Jenelle and again hid the phone under the bush in Jenelle's front yard. After secretly speaking for five or six months, Jamie and Jenelle began to talk about eloping together "in the future[.]"

On Jamie's birthday in February 2010, he went to two parties, one of which was at the victims' residence. He drank so much alcohol at the victims' residence that he passed out. Around 8:30 a.m. the next morning, Jamie's cell phone rang. When he answered, Buddy stated that "Jenelle had left the house and they found her in a ditch and [] she didn't love [Jamie] and . . . [Buddy] told [him] to stay away from her." Buddy then put Jenelle on the phone, and she told Jamie that she did not love him. Although Jamie agreed to stop talking to Jenelle, she called him three days later. Jenelle assured him that she loved him and wanted to keep talking to him. They often spoke on the phone for hours, sometimes all night long, and they sent text messages to one another "all the time." Because Jenelle "didn't want her mother to know they were talking," Jenelle contacted Jamie at odd hours. Additionally, Jenelle always called him because she told him never to call her. Although Jamie considered Jenelle his girlfriend, he could not take her out on dates because Defendant did not approve of him.

Jenelle often spoke to Jamie about "Chris," who she said was a friend of the family and "like a brother to her." Jenelle told Jamie that "Chris" worked for the CIA on "cases and stuff" and that "Chris" had a house in Tennessee and one in Pennsylvania, and he "would go back and forth." Jenelle said that she and "Chris" were the same age, that he had lived next door to her in Pennsylvania, and that they had attended high school together.

Jenelle also spoke about "Chris" to online friends like Bob Meehan, who lived in Pennsylvania. Mr. Meehan never met Jenelle in person, but they interacted through text messages, emails, and Facebook, and he considered himself to be in a "long distance relationship" with her. During his conversations with Jenelle, she occasionally mentioned someone named "Chris," a CIA agent from Pennsylvania who had transferred to Tennessee. Jenelle also communicated daily via text messages with Melanie Clayton, an online friend who lived in North Carolina. Jenelle told Ms. Clayton about "a Chris or

a Matt that she referred to as like a brother to her." Jenelle also told Ms. Clayton that Jamie was her boyfriend.

Defendant and Buddy eventually "warmed up" to Jamie after the death of his mother in May 2011. Buddy called Jamie and "gave his condolences and told [Jamie] if [he] needed anything to give him a call." Defendant also called Jamie and invited him to dinner. Defendant then began inviting Jamie to the Potter residence on holidays. During his visits, Defendant would also talk about "Chris," whom she referred to as her "son."

Jamie recalled that he first met Victim Hayworth when she got a job at Parkdale Mills, and she and Victim Payne began dating. Victim Payne told Jamie that he and Victim Hayworth "hit it right off, and that he . . . just fell head over [heels] in love with her." After Victim Hayworth became pregnant with Victim Payne's child, Jenelle often commented that Victim Hayworth did not "deserve that kid." Jamie told Jenelle that Victim Payne was in love with Victim Hayworth and that he believed the relationship would last. However, Jenelle said that Victim Payne was "not going to keep [Victim Hayworth], that she was just another girlfriend that wouldn't last long." Jamie noticed a change in Victim Payne after he began dating Victim Hayworth. Victim Payne began drinking less and eventually quit partying. Jamie and Victim Payne began working different shifts at the plant, and their camaraderie "kindly dissipated."

Around the time that Victim Hayworth moved in with Victim Payne, Jamie began receiving text messages from "Chris," and he came to believe that "Chris" existed. Jenelle complained to Jamie that people were posting negative comments about her on Topix, and "Chris" also reported to Jamie about the things people were posting about Jenelle on Topix, saying that "it needed to stop." "Chris" said that he was "a friend of Jenelle's[,]" and he told Jamie that he worked for the CIA. "Chris" did not have an email account; he always used Jenelle's email account at BUL2DOG@aol.com, and he contacted Jamie through text or by email sent to Jamie's cell phone from Jenelle's email account. Jamie never spoke to "Chris" on the phone; he never heard his voice or met him face to face. "Chris" told Jamie that he had a "phobia of phones" and did not like using them. Jenelle told Jamie that "Chris" also communicated with her through email.

When Jamie would receive an email from Jenelle's email account from "Chris," he could identify "Chris" as the author based, in part, on the words used in the emails. The emails from "Chris" used words Jenelle did not use. For example, "Chris" would start emails with "hey, man, or hey, dude, how's it going[.]" According to Jamie, Jenelle never cursed, called people names, or spoke hatefully to people. However, "Chris" would "rant and rave about everything" in his emails. He cursed, called people names, and wished harm on others. "Chris" would also typically sign his emails as "Chris." Jamie recalled that "Chris's" hatred was directed at Victim Payne, Victim Hayworth, and

their friends. "Chris" also told Jamie how much Jenelle loved him, and "Chris" advised Jamie on how to improve his relationship with Jenelle.

While the phone harassment charge was pending against Jenelle, Jamie would often visit the Potter residence, and Defendant "would bring [Jamie] up to speed on who was emailing what, or . . . what all the bad things that they'd said about Jenelle. And that ["]Chris["] was angry and that . . . ["Chris"] was firing back with emails and it was like a war." When speaking with Defendant and Buddy about these issues, Buddy said that he did not understand "why they were doing it" and that he wanted it to stop. Defendant asked Jamie and Buddy, "[W]hat are we going to do[?]" Buddy talked about his missions in other countries, and Defendant mentioned that Buddy had been in the CIA. Jamie knew that Buddy owned many guns and carried two guns all the time—one in a shoulder harness and one on his ankle. Jenelle was present during these conversations but remained silent. Jamie noted that, when she spoke to him on the phone, Jenelle was "opinionated" about things, but when she was around her parents, she acted "needy" like "a kid to a parent."

Jenelle had diabetes and had to check her sugar levels and give herself insulin. When Jenelle's sugar "got out of range," she would be hospitalized and unable to communicate with Jamie for days. As the threat of a possible criminal conviction loomed for Jenelle, Jamie began receiving emails from "Chris" that were sent from Jenelle's email account, in which "Chris" expressed his concerns for Jenelle's heath and stated, "I hope [Jenelle] don't [sic] think about killing herself[.]" Jamie responded to "Chris's" email by stating:

> I think that if it wasn't for us she might have thought about it, didn't say it, but I can tell she has just took all she can take from those motherf****s. They won't let up and they're crazy. Hell, I don't know why they have to do this. I don't know their life has to such at the point that they see this as a sick joke or . . . something, dumb bastards.

Around this time, Jamie gave Jenelle a ring during a trip to Boone with Jamie's niece, Lori Curd. Although Jamie was in love with Jenelle, Defendant did not know that he and Jenelle were in a relationship. Jamie felt "intimidated" by Defendant, and he "walk[ed] on eggshells" around her because he wanted her approval. During visits to the Potter residence, Defendant continued to relate to Jamie "what all was being said[,]" and Defendant told Jaime that the victims and their friends were "trying to add [Jamie] to the mix." In subsequent emails, however, "Chris" assured Jamie, "I've got your back." "Chris" claimed that he had Ms. Thomas under surveillance twenty-four hours a day and that he had "shot her back glass out of her car[,]" and Jenelle told Jamie that "Chris" had followed him around town one day and was watching over him.

After the public confrontation between Victim Payne and the Potters the day that the phone harassment case was dismissed, Victim Payne called Jamie. Victim Payne was upset and told Jamie that he had a folder "about two inches thick of emails and stuff that he'd printed off the internet [] saying how he was a bad dad and how he didn't deserve his children and . . . he said it hurt." Victim Payne believed that Jenelle had posted these negative comments, and Victim Payne admitted that he was "posting stuff about Jenelle and it was just going back and forth." Victim Payne told Jamie that "Chris" was not a real person and that Jenelle was pretending to be "Chris."

Thereafter, Jenelle continued to post several times a day on Facebook that Ms. Thomas and Victim Hayworth were "mean" and "whores" and should be "punished." Jenelle also posted similar messages on Topix about Ms. Thomas, Victim Hayworth, Victim Payne, and the victims' baby. One such post on Topix referred to the baby as "that damn baby." Most of the content related to Jenelle's "wish[ing] bad" on the victims. Around this time, Jenelle "let it slip" to Jamie that "she was going to have to start calling [Ms. Thomas] again." When Jamie asked Jenelle about this comment, she "got real defensive" and "wouldn't say anything else about it." Jamie stated that, until that time, he believed that Jenelle was not engaging in any phone harassment of Ms. Thomas. Jenelle later told Jamie that someone was "spoofing her phone to make the phone calls" to Ms. Thomas. However, Jenelle did not say anything about someone "hacking her emails."

On the evening of January 30, 2012, Defendant called Jamie and invited him to the Potter residence to work on the computer. While at the Potter residence, Buddy came into the computer room and asked if Jamie would "do him a favor." Buddy asked Jamie to "take him down next to [Victim Payne's], let him out and go down the road and come back and pick him up." However, Buddy did not specify a time or date. Jenelle and Defendant were not in the room when Buddy asked for this favor. When Jamie returned to his home, Jenelle called him on his home phone and told him that Buddy needed Jamie's help to "do something." Jamie told Jenelle that he wanted to work on his computer, and he needed to hang up to use the phone line. Jamie then received a text message from Jenelle's cell phone that read, "[I] would not take you[r] cell phone with you in the morning love[.]"

In the early morning hours of January 31, 2012, Jamie's home phone rang again. By the time he reached the phone, however, it had stopped ringing. Jamie's caller ID showed that the phone call came from the Potter residence. Jenelle then sent Jamie a text message telling him that Buddy "was trying to call [him]" and instructing Jamie to call Buddy back. Jamie called Buddy, and Buddy asked if Jamie could do that "favor" for him that morning. Jamie agreed to help Buddy, and moments later, Jenelle sent Jamie a

text message that said, "Daddy's leaving[.]" Buddy arrived at Jamie's residence while it was still dark outside. He got into Buddy's vehicle, and Buddy drove to the parking lot of a church near the victims' residence. When they pulled in, Jamie asked Buddy how far down he was to drive, but Buddy said that Jamie "may not have to go." Jamie and Buddy sat in the church parking lot and waited for Paw Bill to leave the residence. After Paw Bill left for work, Jamie and Buddy walked across a field towards the victims' residence. Once there, they walked behind a shed behind the residence. Jamie told Buddy that if Victim Payne saw them "all hell [was] going to break loose[,]" and Buddy handed Jamie a gun. Jamie told him that he could not kill anyone, and Buddy responded that he just needed Jamie to "stand at that door."

The two men walked around the shed and entered the victims' residence through the back sliding glass door. Jamie stood at the door while Buddy went down the hallway and entered the first bedroom. Jamie heard Victim Payne say, "[W]hat the hell[,]" and Victim Hayworth ran out of the bedroom and further down the hallway. Jamie then heard a gunshot. Moments later, Buddy came out of the bedroom and looked at Jamie. Jamie pointed down the hallway in the direction of Victim Hayworth, and Buddy proceeded down the hall. Jamie looked inside the first bedroom and saw Victim Payne lying on the bed. When Jamie heard another gunshot, he ran out of the residence and back across the field to Buddy's vehicle. He gave the gun back to Buddy when Buddy returned to the vehicle. After the murders, Buddy dropped off Jamie at the end of his driveway. Jamie got out of the vehicle, walked across the road, and "got sick." He then went to Ms. Curd's trailer because he did not want to be alone. He told Ms. Curd that he had received a text message from "Chris" that said "the problem was over[.]" Jamie was interviewed by investigators the day after the murders, but he denied any knowledge of the crimes.

**The Investigation**

On February 2, 2012, Chief Deputy Woodard and Agent Lott conducted an interview with the Potters at their residence on Hospital Road, which was located approximately "[f]ive to eight miles" from the victims' residence. A recording of the interview was played for the jury. During the roughly hour-long interview, Buddy, Defendant, and Jenelle denied any knowledge of the murders beyond what had been reported on television. However, Jenelle told the investigators that the victims "had been harassing the living crap out of [her]." She explained that she first met Victim Payne through Ms. Greenwell. Jenelle recalled that, on one occasion, Ms. Greenwell took her rock climbing with Victim Payne, Jonathan Lewis, J.R. Burgess, and several other girls. She stated that Victim Hayworth did not go rock climbing and that Victim Payne was dating someone else at the time. Jenelle recounted that she attended a party one time at the victims' residence with Ms. Greenwell but that the drinking, drug use, and weapons present at the party made her uncomfortable, so she ended up sitting out in the car in the

- 16 -

driveway. Jenelle later told Ms. Greenwell that she would never go to another party at the victims' residence. Buddy stated that one of the guns Jenelle described as being at the party was an AK-47.

Jenelle stated that her problems with the victims began when the victims' friend, Ms. Thomas, cussed her out at a grocery store for using a food stamp card. Jenelle said that, after this incident, "They made up three Facebooks of me using my picture." She claimed that they "hacked" into her social media accounts and harassed her. Defendant stated that they "hack[ed] in" and threatened Jenelle, saying "We want you dead." Defendant claimed that Ms. Thomas made a fake Facebook account and used the fake account to tell Jenelle, "I'll stomp your f***ing a**." Defendant recounted that Buddy caught "them" trying to put sugar in the Potters' gas tanks and that "they" scratched Buddy's truck, broke their garage door, and threw rocks at the house and Jenelle's window. Jenelle denied ever posting anything negative on the internet about the victims; she stated that she had only asked Victim Payne, Victim Hayworth, and Ms. Thomas to "leave her alone." When asked if she had wished the victims dead online, Jenelle responded, "[N]o, no. I'm not that mean. I just tell people to leave me alone."

Jenelle explained that she eventually went to court over claims that she was harassing Ms. Thomas. She recalled that, after one court date, she had to be carried out of the courtroom by Buddy and Jamie due to illness, and as she was being carried out, Victim Hayworth, Mrs. Osborne, and Ms. Thomas told her, "I hope you die." One of the investigators asked Jenelle why the victims and their friends were harassing her, and Jenelle stated, "It came out to be a jealousy thing. They said I was too pretty; that I wasn't from here so [I was] never going to be accepted." Jenelle also told investigators that one of the victims' male friends had threatened to rape her. Jenelle stated that she almost died due to the stress caused by the situation. She explained that she had "heart problems" and that the victims and their friends had known that she would get "very sick" under stress.

Jenelle further stated that Victim Payne "ran his mouth" about Buddy and Jamie selling drugs. She explained that Victim Payne was upset with Jamie because Jamie went to court with the Potters on Jenelle's behalf. Defendant added that Victim Payne talked about having a gang, which he claimed was "bigger than MS-13." Buddy stated that he did not go to bed until 6:30 or 7:00 a.m. because he had to watch over Jenelle and Defendant. Jenelle then recounted that Victim Payne had parked his truck by the Potter residence and shot a gun at the house. She stated that Victim Payne also shot a gun at Jamie's trailer. Buddy stated that he believed Victim Payne had been shooting over the Potter residence because he found no bullet holes in the structure. Jenelle stated that she ended up in the hospital after Victim Payne shot at their house. She said that Victim Payne told her, "I'm going to kill you. I'm going to get you at some point."

Jenelle stated that the situation had somewhat resolved itself following the final court date with Ms. Thomas on November 30, 2011. She stated that she had received one threatening email from Ms. Thomas since then, but she had not seen the victims or any of their friends. Jenelle recounted, however, that one of the victims' best friends, Nicky Church, hit her "for no reason" the week before the murders. Jenelle told investigators that going out with her parents did not guarantee her safety because "they" would kill Buddy and Defendant to "get to [her]." When asked about her relationship with Jamie, Jenelle denied that Jamie was her boyfriend. She claimed that he was "just a friend," who had worked on the Potters' computer "a little bit." Investigators left the Potter residence at the conclusion of the interview without making any arrests.

The "first break" in the case came approximately one week after the murders, when investigators interviewed Jamie for a second time. It was during this meeting that Jamie admitted to "some role" in the homicides and identified Buddy as the shooter. He told investigators that he was at the victims' residence at the time of the murders and that Buddy shot the victims. Jamie explained that, when Victim Hayworth ran out of the first bedroom, he blocked the front hallway. Jamie provided a statement and submitted to a polygraph examination. At one point during the interview, Jamie asked Agent Lott if "the CIA was there." Agent Lott was confused by the question because he was unaware of any role or participation by the CIA, and none of the investigators had mentioned the CIA during the interview. Jamie testified at trial that he asked investigators about CIA involvement because Buddy had told him "he was with the CIA." He said that he was "hoping the CIA had [his] back" and that "Chris" was real. However, he acknowledged that "Chris" did not exist and never existed. Jamie testified that he was manipulated by the Potter family. He explained, "Well, I mean, I thought Chris was real. I mean, I thought that there was a, you know, someone that I was talking to there and Jenelle the way she would talk to me . . . it was like a -- a bonding . . . a family. And it's like it's all a lie."

Following his confession, Agent Lott asked Jamie to call Buddy. He instructed Jamie to ask Buddy what he had done with the gun and knife used during the murders. The recorded phone call from Jamie to the Potter residence was placed late in the evening of February 6, 2012, or in the early morning hours of February 7, 2012, and the State played the recording for the jury. On the recording, Defendant answered the telephone and spoke with Jamie for a few minutes. Defendant referenced receiving an email sent by "Chris" that indicated Jamie had been arrested. Defendant asked Jamie if he had taken a lie detector test and whether he had "passed" it. Buddy then spoke with Jamie. Jamie asked Buddy if he "got rid of everything from Bill's." Buddy responded, "Uh-huh." Jamie then said, "Okay, that makes me feel a lot better," to which Buddy replied, "Yeah."

Following the recorded phone call, investigators obtained an arrest warrant for Buddy and a search warrant for the Potter residence and Buddy's vehicle. The search warrant was executed on February 7, 2012. During the execution of the search warrant, Chief Deputy Woodard logged evidence in the living room of the Potter residence as other investigators brought items of evidence to him from various parts of the house. At one point, Investigator Starling McCloud placed a stack of papers on a chair beside Chief Deputy Woodard to be logged. Defendant—who had been sitting on a couch in the living room beside Jenelle—then reached over, picked up the stack of papers, and ripped them in half. Chief Deputy Woodard instructed Defendant to "give [him] those papers." The stack of papers consisted of emails that contained several photographs of Ms. Potter, Ms. Thomas, and Victim Hayworth believed to have been taken from Facebook. Chief Deputy Woodard noted that, in one of the emails containing only a photograph of Victim Hayworth, the subject line read, "Billie whore[.]"

During the search of the Potter residence, law enforcement officers seized one computer with an external hard drive. In the computer room, investigators found a green spiral notebook on a desk next to the computer monitor, which contained passwords to various internet accounts, including passwords for both Jenelle's and Defendant's AOL email accounts. Thirty-two firearms and a round of .38 caliber ammunition were also collected during the search.[5] Additionally, investigators seized Buddy's truck. Agent Lott then turned over several of the seized items, including Buddy's truck, to the TBI crime lab for testing.

Buddy was interviewed by investigators after his arrest. He then placed a recorded phone call to Defendant, and this phone call played for the jury. During the recorded phone conversation, Buddy told Defendant that he was involved in the murders and that he "did it." He told her that he "did it" because of what "they" tried to do to Defendant and Jenelle. He stated that he "didn't want [Defendant] to be afraid no more." Defendant responded that he could not have committed the crimes because she saw him "sittin' there" at home during the time of the murders. Buddy told Defendant, "I love you. I did it to protect you." Defendant then instructed Buddy, "[Y]ou are not guilty because you were here. You have to say that." She reiterated, "You were here. I saw you." Before concluding the call, Defendant again said, "Don't worry, honey. You were right here. I saw, you right here."

Buddy's truck was eventually processed for evidence at the TBI crime lab. Investigators discovered three trash bags of shredded paper in the truck bed under a truck bed cover. TBI Special Agent Miranda Gaddes later pieced together some of the

---

[5] Additional firearms were found but not taken from the residence because they were not the type of gun associated with the homicides.

shredded documents. The documents, which appeared to contain email messages, were introduced at trial, and Agent Lott read portions from thirty pages of the shredded documents. The dates of the documents were from March 12, 2011, through January 25, 2012. Seven of the thirty pages contained no identifying information such as dates, email addresses, or names. The messages appeared to be between Defendant and "Chris," and many of the messages referenced "Chris's" attempts to obtain a CIA identification for Buddy.

Generally, the content of the documents concerned the harassment the Potter family, specifically Jenelle, was suffering at the hands of Victim Payne, Victim Hayworth, Mrs. Osborne, and Ms. Thomas, and they contained disparaging comments about these people. Many of the messages included some sort of threat or desire for violence, harm, or death to this group. The messages from "Chris" indicated that he was watching the victims and their friends and was aware of the groups' plans to harm Jenelle. One specific message from Defendant's email account to "Chris" stated that Victim Hayworth, Mrs. Osborne, and Ms. Thomas "***need to die!***" In another message, which contained no identifying information as to the date of the email or the email addresses from which it was sent and received, the writer stated that they would kill Ms. Thomas "and [Victim Payne] then [Victim Hayworth] for sure."

Following this discovery, Agent Lott began to focus the investigation on the electronic communications among Defendant, "Chris," Jenelle, and Jamie, leading up to the murders. Agent Lott collected evidence from three primary sources: Jenelle's and Jamie's cell phones; Jenelle's Facebook account; and Defendant's, Jenelle's, and Jamie's email accounts.

In his review of the email correspondence, Agent Lott first noticed that multiple emails sent from Jenelle's and Defendant's email accounts contained photographs of "Chris," his dog, and his friends. However, neither Agent Lott nor members of Johnson County law enforcement were aware of any CIA activity or a CIA agent named "Chris" working in Johnson County. Some of Defendant's and Jenelle's emails contained references to "Chris Tjaden," which led the investigators to believe that this was the last name of the "Chris" writing to Defendant. During the course of the investigation, Agent Lott traced the name Christopher Tjaden to an individual living in Delaware. Mr. Tjaden worked as a certified constable in Wilmington, Delaware and had previously worked for the Delaware City Police Department. Mr. Tjaden had attended high school with Jenelle, whom he recalled as being "very strange." Mr. Tjaden said that he had two classes with Jenelle; he had spoken to her occasionally, but they had separate groups of friends. Mr. Tjaden stated that he had not had contact with Jenelle since he graduated from high school in 2000. Mr. Tjaden said that he had never met Defendant or Jamie and that he had never served in the CIA. He was shown an email sent from Defendant's email

account to Defendant's email account on September 1, 2011, with the subject line "Pic of CHRIS, our son[.]" This email contained text that read, "this is Chris TJaden back at youth camp, w/ Jenelle – age 18 or so (our son)[,]" along with a blurry photograph of two people wearing what appeared to be military fatigues. Mr. Tjaden stated that he was not in the photograph. However, when shown an email sent from Jenelle's email account to Defendant's email account on September 13, 2011, Mr. Tjaden recognized the photograph in the email as one of his profile pictures from his Facebook account. Mr. Tjaden identified the same photograph in an email sent from Defendant's email account to Defendant's email account with the subject line "Pic of Chris-Barb cropped & enlarged/plus auto adjust/contrast/brightness..5X7[.]" Mr. Tjaden also identified himself in two additional photographs contained in an email sent from Jenelle's email account to Jamie's email account on October 22, 2011, with the subject line, "Me Chris." He stated that one of the photographs was of him at a baseball game and the other photograph was of him standing next to his patrol car. Mr. Tjaden had previously used both photographs as profile pictures on Facebook. Mr. Tjaden did not recognize the remaining photographs contained in emails sent from Jenelle's email account to Jamie's email account and from Defendant's email account to Defendant's email account purporting to be of or related to "Chris."

### Jenelle and Jamie's Cell Phones

Agent Lott testified that Jamie's primary cell phone number was 423-291-1415 ("Jamie's cell phone") and that the number of the cell phone used by Jenelle was 423-707-4786 ("Jenelle's cell phone"). Agent Lott obtained from Verizon a call log and a copy of the text messages sent to and from Jamie's cell phone for a seven-day period. The entire document was admitted; however, Agent Lott's testimony focused on communication occurring on January 31, 2012—the day of the murders.

Agent Lott testified about phone calls between the defendants during the early morning hours of January 31. He noted an eighteen-minute phone call between Jamie's cell phone and Jenelle's cell phone at 1:47 a.m. At 2:21 a.m., a text message sent from Jenelle's cell phone to Jamie's cell phone indicated that Jenelle wished to "talk for just a little." The call history for the phone numbers confirmed that, after this text message, a "[v]ery lengthy" phone call (approximately thirty minutes) occurred between Jamie's cell phone and Jenelle's cell phone. At 2:30 a.m., a text message was sent from Jenelle's cell phone to Jamie's cell phone stating, "I love you. I would . . . not take your cell with you [ ]in the morning. Love."

There were also several phone calls between the Potters' home phone and Jamie's cell phone. The phone records showed a twenty-two second telephone call from Jamie's cell phone to the Potters' home phone at 4:08 a.m. At 4:25 a.m., a text message was sent

from Jenelle's cell phone to Jamie's cell phone asking, "[D]id [Buddy] get the phone[?]" A text message from Jamie's cell phone responded, "[N]o." At 4:26 a.m. a text message from Jenelle's cell phone was sent stating, "S\*\*t call back." At 4:26 a.m., there was a sixty-one second phone call from Jamie's cell phone to the Potters' home phone.

From 4:28 a.m. until 4:40 a.m., a series of text messages were exchanged between Jenelle's cell phone and Jamie's cell phone. A message from Jamie's cell phone confirmed that Buddy had received Jamie's phone call. At 4:36 a.m., a message from Jenelle's cell phone to Jamie's cell phone stated, "Is leaving now the front door open and closed." A message sent from Jenelle's cell phone at 4:38 a.m. read, "Yes hes leaveing now i hear the car i love you baby." The following minute, a text message was sent to Jamie's cell phone from Jenelle's cell phone that stated, "I love you he took off love you." The next message was sent from Jenelle's cell phone to Jamie's cell phone at 4:40 a.m. and stated, "I love you. Text me ASAP when you get back." This was the last text message or phone call between the parties for approximately seventeen hours.

Agent Lott testified that, at 10:11 p.m., Jamie's cell phone received a text message from Jenelle's email account that read, "(Re; I have been worried about) baby you are ok. And like [Buddy] said come over and talk ok,.. I love you somuch]." Another text message sent to Jamie's cell phone from Jenelle's email account at 10:11 p.m. stated, "I love you so much baby/ He said you were sick so[]i left you alone]".

### Jenelle's Facebook Account

Agent Lott testified that he obtained between 2700 and 2800 pages of content from Jenelle's Facebook account. The State introduced approximately 100 pages of this content. The postings began on January 1, 2011. The substance of the posts and comments were largely about Jenelle's illness and the harassment she suffered from the victims, Ms. Thomas, and Mr. and Mrs. Osborne. Jenelle referenced the "hacking" of her account multiple times and directly addressed the victims, Ms. Thomas, and the Osbornes about their alleged harassment. She also posted pictures of "Cody" or "Chris" and referenced his involvement with the CIA. On April 30, 2011, Jenelle stated that Ms. Thomas, Victim Hayworth, Victim Payne and "a few others" had threatened to kill her and then Buddy. She explained their motive as follows:

But it came out they dont like me b/c i'm smart and i'm very pretty and they cops are mad b/c they go up there and lie and they they come to [ ] me and ask me things. And now they have stoped b/c dad went up there and kicked there butts.

On October 22, 2011, Jenelle posted that she had become so stressed and her sugar so high while she was in court that she had to be escorted out by Jamie and Buddy and hospitalized. She stated that, as she was leaving the courtroom, "they" said, "[W]e hope she dies[.]" Jenelle posted, "They want me dead," and she claimed that "they [were] saying they [were] going to kill [Buddy] then [her]."

On November 21, 2011, Jenelle listed both "Chris Potter" and "Matt Potter" as her brother on Facebook. Using Jenelle's Facebook account, "Chris" posted threats to the victims and others. One such post, dated December 14, 2011, reads as follows:

> TO BILL PAYNE, BILLIE JEAN HAYWORTH, LINDEY THOMAS AND TARA AND BRAD [OSBORNE] AND ECT: PLEASE LEVE JENELLE ALONE AND STOP WITH THE HARASSMENT AND STOP TRYING TO RUN HER LIFE. LOOK AT YOUR OWN LIVES AND WORK ON THAT. B/C YOU ALL ARE JUST A BUNCH OF WHITE TRASH NO GOOD UGLY PEOPLE THAT LOVE TO HURT OTHERS WELL YOU NEED TO THINK OF THIS  TAKE CARE OF YOUR KIDS [VICTIM PAYNE] AND [VICTIM HAYWORTH] AND LINDEY GET OFF YOUR METH DRUGS AND STOP GOING AFTER MY SISTER AND MY FAMILY THANK YOU. ORYOU CANJUST GO JUMP OFF A MTN FOR ALL I CARE YOU ALL NEED TO GET OUT OF MY SISTERS LIFE.

On January 14, 2012, Defendant posted on Jenelle's page, complaining about "Evil ppl" and asking that "God . . . have Mercy on their souls[.]" Jenelle posted on January 14, 2012, "I'm sick of hearing they want me dead and Lind[s]ey want[]s to kick my butt it's never going to happen [I]'m never alone and my Dad carry[]s guns and my Mom, so they just need to back off. We have no law here and it makes me sick." Jenelle explained that Buddy "went up to them so called cops on the hill and had a meeting with them" but that law enforcement "did nothing[.]"

### Defendant, Jenelle, and Jamie's Email Accounts

Investigators learned that the email account associated with Defendant was bmp9110@aol.com, the email account associated with Jenelle was BUL2DOG@aol.com, and the email account associated with Jamie was sleepiingbear@yahoo.com. Investigators obtained subpoenas for records from Yahoo and AOL in relation to the aforementioned email accounts, and Agent Lott received a DVD containing thousands of emails.

Agent Lott also sought subscriber information and internet records for Jamie and the Potters, who had internet service and landline service through Century Link. Deborah Evans, a Century Link employee, retrieved subscriber information and internet records for Jamie. In setting up the account, Jamie provided his name, home address on Pleasant Valley Road, telephone number as 423-727-0200, and his email address as "sleepiingbear@yahoo.com." As to the Potters' account, the Potters provided the Hospital Road address, the phone number 423-727-5593, and the email address BBPotter@hotmail.com. Ms. Evans explained that Century Link differentiated between customers based on subscriber information, "network circuit path ID's[,]" which "show how a path for an internet customer goes from a central office to their home," and IP addresses.

Ms. Evans testified about IP addresses as follows:

IP addresses are a group of numbers that are assigned to a customer when they attempt to log on to use the internet. If it's a dynamic IP address it can change, that group of [ ] numbers will change. If it's a static IP it remains the same and those are usually used for huge companies.

Ms. Evans explained that the data related to a customer "logg[ing]" onto the internet was stored in Century Link's data server at their central office. Information on the internet sites accessed by the customer, however, was not tracked or stored by Century Link.

The State showed Ms. Evans a redacted sample email. She identified the first line of the email as the subject line and explained that the sender of an email would compose the subject line. The next field on the printed email was the "From" line, which contained the email address that sent the email. The next field contained the date and time the email was sent, and the next field contained the email address where the email was sent. Ms. Evans explained that the field titled "Return-path" showed the address that would be used if there was a reply to the original email. She identified the Century Link IP address in the final field on the page. Ms. Evans explained that, when an email contained the same email address for both the sender and the recipient of the email, it meant that the email was sent and received from the same IP address.

Both Jamie and the Potters had dynamic IP addresses, so Ms. Evans retrieved multiple IP addresses associated with Jamie's and the Potters' Century Link accounts during the time period of January 4, 2011 through February 21, 2012. Ms. Evans provided Agent Lott with these records, and using the Century Link documents, Agent Lott compiled a list of IP addresses associated with the Potter residence and Jamie's residence on Pleasant Valley Road.

Agent Lott identified statements typed out by Defendant and Jenelle, a handwritten affidavit written by Jenelle, and several other documents "known" to be drafted by Defendant and Jenelle. He explained that he used these documents to identify patterns in their writing for comparison with emails sent from their Yahoo and AOL accounts. With respect to Defendant, Agent Lott reviewed Defendant's typewritten statement, which she prepared in Chief Deputy Woodard's presence, as well as emails that Ms. Groover identified as being written by her mother. Agent Lott highlighted, in yellow, patterns in Defendant's writing such as the use of the abbreviation "yrs" for the word years; the use of the ampersand symbol; "tho'" instead of though; "thru" instead of through; and the frequent use of hyphens, dashes, and parenthesis. Defendant used alternate words separated by a forward slash "quite often" in her writing. Agent Lott said that he also observed that Defendant began many sentences with "oh well" or "anyway" and frequently used ellipsis. Additionally, Defendant often used "B C" for the word because, but "a couple times" she used "B/C." She also used the term "hang in there" or a variation of the phrase (hanging in there, hung in there) in the documents.

In reviewing Jenelle's known writings, Agent Lott observed that Jenelle often left a letter or two out of a word and capitalized words that did not require capitalization. She frequently used run-on sentences and transposed letters ("siad" instead of "said"). Jenelle's writing contained frequent separation of a single word into two words, such as "out side," and she often began sentences with "and." Jenelle failed to use double consonants where required before adding a suffix and left the "e" in the root word when adding "ing," *e.g.*, "leaveing" rather than "leaving." After highlighting the documents, Agent Lott created a legend of Defendant's and Jenelle's writing patterns. He then compared the documents with emails sent from Jenelle's and Defendant's email accounts to Jamie. The known writing samples from Defendant and Jenelle were provided to the jury as an exhibit, along with Agent Lott's legend and the "unknown" emails.

The State submitted 209 pages of printed material associated with Defendant's, Jenelle's, and Jamie's email accounts. These pages constituted sixty-seven emails sent between the three email accounts. The emails were dated from January 1, 2011, through January 16, 2012. Although there were only three email accounts, Agent Lott noted that there were four identified writers in these communications: Defendant, "Chris," Jenelle, and Jamie. All of the emails that identified "Chris" as the writer of the email came from Jenelle's email account. All emails identifying Defendant as the writer came from Defendant's email account, and all emails that identified the writer as Jamie were sent from his email account.

We will summarize the emails chronologically but note that there are three main categories of email correspondence, between: (1) Defendant and "Chris;" (2) "Chris" and

Jamie; and (3) Jamie and Defendant. The emails between Defendant and "Chris" begin January 1, 2011, with the last one being sent on December 16, 2011. The initial emails between Defendant and "Chris" contained information about Defendant's conflicts with Ms. Groover and other extended family.

As the months progressed, discussion of the family conflict diminished, and the focus of the messages between Defendant and "Chris" became the victims and Ms. Thomas. Throughout the emails, "Chris" shared information about his work with the CIA and referenced the local Johnson County law enforcement as "dumb." He wrote about his intervention in the harassment by the "mean girls" and how he defended Jenelle, whom he described as a "good person" and as "trying to make peace." "Chris" warned Defendant of potential threats to her and her family's safety. A common criticism throughout "Chris's" writing was his distrust of and the ineffectiveness of local law enforcement. Most of the emails from "Chris" were sent from Jenelle's email account to Defendant's email account; however, several emails were sent from Defendant's email account to Defendant's email account and contained messages copied from Facebook.

In an email dated January 1, 2011, sent from Jenelle's email account to Defendant's email account, "Chris" wrote to Defendant. The subject line of the email indicated that the content of the email was messaging between "Chris" and Defendant that had been copied from "Chris's" My Space page on December 31, 2010. The email began:

HIM:

Hi Barbara

How are you? I hope you are well. Yes this is Chris AKA Cody. I'm so sorry to hear all of that is going on. I wish there was away tohelp you all. I cant come up there and see you if someone saw me it would not be a good thing. I hope to get out and talk tho. . . . I run by topixs b/c i saw that they said Jenelle was up here and with you both buddy and you and i saw it and got on there and i took care ofit they were doing nothing about it.

"Chris" told Defendant about his work with the CIA, claiming that he had "got[ten] rid of" people in Russia and New York. He wrote that he had shot "a lot of" people while working for the CIA. He explained to Defendant, "I got to[]a point where they were bad ppl and i new it was us or them so i had to kill. But i love to shoot now. and Killing does not borther me at all." "Chris" informed Defendant that, "at the office," he was known as "[C]ody [W]ize." "Chris" told Defendant that he could kill Ms.

Groover and Defendant's "family in PA[.]"  He stated, "[I] have [] each one of them inmy sights and i can get to them anytime.  I just might."  "Chris" warned Defendant of potential threats to her safety and advised that she should not go to her mother's house alone.  "Chris" wrote that he would work on getting "everything off" of Topix, noting that he had "so much on them all."  He concluded with "I love you all" and "your son Chris."

The rest of the content of the email also appears to have been cut and pasted from Myspace.  The first response was from Jenelle's email account to "'Cody'" and signed by "Mom Barb & Jenelle."  The second message was written to "Chris" and signed by "'mom' Barbie."  In this message, "'mom' Barbie" shared that Ms. Groover took her and Jenelle to court "in July/Aug to try to keep me away from my mother."  She continued, "I warned my mom that she would come between us, and she has."  "'[M]om' Barbie" wrote that "Chris" and Buddy "NEED[ED] to talk" and said that she had been

> trying to get [Buddy] to come up to ask for Cody Wize and walk you outsdie so the girls out front can't listen and you can talk, then come to the truck and me and Jen will be in the back seat where no one can see us (black windows ya know) and we can say hello to you.

As she discussed the family conflict, "'mom' Barbie" warned that "Buddy says if they kill me (heart/stroke,etc. /health pros. due to stress) that he will do what he was trained to do."  She told "Chris" that, if he wanted to meet with Buddy, to let her know when and where and that she would pass the message on to Buddy.  She also encouraged "Chris" that "as long as you are doing the right thing for mankind, then you will not be judged badly.  If it is like Buddy did, you are helping others by getting rid of the bad."

"'Mom' Barbie" also communicated her desire for Jenelle to have someone to "take care of her and be good to her."  The message to "Chris" read, in part:

> These guys down here are trash and we threw the last one out last year in Jan. – jerk Jamie Curd.  He took advantage of me, & was dirty, muddy, and walked in the house any old time, even when Jen was in the hospital one time!  He did not have good manners and smelled too.  He used to hang out with [Victim] Payne, the 'maybe' father of [Victim] Hayworth's baby, not sure yet, and he is running a whore house you know.  We would not let her go out in the car with him bc he had a trap for a car and we did not have a trust with him.  She did not want to go out with him either.  She is such a good person.

She then transitioned to harassment by the victims, as follows:

- 27 -

We have no way to fight back. and when we went to the Sheriff's office, they gave us lip service. The guys' name was Brad Sutherland and he told us what a sharp computer kind he was and he'd take care of it all. Jenelle's 3 names disappeared once, but they added them back on. Isn't that awrful – [Ms.] Thomas and [Victim] Hayworth started it for some crazy reason bc they saw [Jenelle] out and got jealous of her looks . . . but we never joined topix and will never do so.

In an email dated January 1, 2011 sent from Jenelle's email account to Defendant's email account, "Chris" informed Defendant that "[a]s far as my Job Buddy can be called at anytime and might here in a few weeks We need all the CIA we can get to do a Job." "Chris" further stated:

Buddy is 2ed on the list and I'm def [] on top b/c i'm in it. buti know a John is #1 and Buddy is #2 and then i guess iwill be called if they need me. I know [Victim] [H]ayworth and [Ms. Thomas] and [Victim Payne] . . . [have been] told them more then once to stop. and leave Jenelle and you all alone. But it didn't stop intill i had to say something. They are just mean girls lol.

In a responsive message, "Barbie" wrote,

WoW!! I never knew how much I was hated or how much I am In Danger at all! Thank you so much for all of the information hon. I am going to print this and delete it, tell Buddy about it, and he will take action as needed and wait to hear from you if want to meet, etc. -ya know."

An email from "Chris" was sent from Jenelle's email account to Defendant's email account on January 5, 2011. The email contained a copy of a Facebook message to "Chris" from "Barbara." In this message, "Barbara" told "Chris" that

[Victim] Payne has been in our home a few times, but not since Nov.2009. he brought that guy,Jamie Curd,up here to get Jenelle,& it made us mad bc he was not good for Jen at all. He told Jen to run away from home 5:30 a.m. in the morning last Feb.& he'd pick her up,but he didn't show . . . and Deputy SeanBrown' [] picked her up, frozen, mixed up, a mess, and they called us to come up & get her. Then we had her call Jamie & tell him to not come around anymore,but it took some rough treatmt fr us to get rid of him; he wouldn't stop! Finally by end of March, told him off good,Bud warned him for the last time,&its over. The guys down here are basically

no good . . . and she has finally found out. I don't know much about him,but he lives back in the holler,Jen would not survive long over there w/his old grouchy sick mom. She would have been alone most of time,tried to be a nurse for mom. But! She was so sorry she did that; he had her brainwashed & so scared& mixed up.

"Chris" responded in a Facebook message by defending Jamie, writing that Jamie "told everything" on Victim Payne and that Jamie no longer went to the victims' residence. "Chris" wrote that Victim Payne had been "hateful" to Jamie since Victim Payne began dating Victim Hayworth. In a responsive message to "Chris," "Barbara" stated that she did not know why "Jamie said good things about us" and said that "Jamie was not welcome here ever again." She referred to Buddy as "a sharp shooter & sniper" and indicated that Buddy was "ready." She also wrote that "Bud says to tell you that he has a Son that has kept him pretty informed thanks to you[.]"

In a March 3, 2011 email sent from Defendant's email account to Defendant's email account with the subject line "FACEBOOK – 3/1-3/2-3/3 – EMAILS TO/FROM CHRIS (Barbara) – Print n File," "Barbara" wrote:

Bud was wondering When he would be contacted to meet and pick up his ID you spoke of some time ago. Just for YOUR info, He IS home every day now (as I am home), he can come alone bc Jenelle can be w/me,. HE is Actually wondering IF there is an ID or not!

"Chris" responded:

Yes I saw the ID they have not gave it to him yet??? That's what makes me so mad they say they will do it and they have not called him. I even TOLD my BOSS about it and he said yes and that he would get Tommy to talk to him. I don't understand them I will say something for Buddy b/c he does have it and I have seen it and is just like ours.

. . . .

I will be talking to someone I work with about giving him his card. I don't know why they would be wafting? I don't get this. But I'll talk to my Boss.

"Barbara" then responded:

- 29 -

Thanks for bugging them anyway Chris, but if they have decided Not to give the ID to Bud, we have to understand. He'd really like to be involved in a lot of things, espec. [Ms. Groover], cuffing her when time comes, etc.

In a Facebook message drafted on March 2, 2011, "Barbara" informed "Chris" of a recent incident of harassment involving some cash that the victims or their friends had allegedly taken from the Potters' mailbox. The message read, "They are watching our house all the time, threw stuff on the roof, yard, etc. grrr.) I'm not strong enough to fight back yet . . . but I will be at some point. Bud is angry!!!!"

In another Facebook message to "Chris" dated March 3, 2011, "'Mom' Barbara" wrote:

Jen ran into Lindsay yest. At RiteAid & Lindsay said, "Your day is coming." To Jen. Jen stood up to her and said "Why wait?" "I dare you to touch me here and now." And Lindsay backed off some & acted tough, but she's not w/o All her rotten no good so-called friends . . . ha! I was proud of Jenelle &as far we say, Jen will Never be alone w/o one of us in the trucks or with her in a store, so THEY better Watch Out! We are Tired of all of this sh** Chris! 7 yrs. Is 7 yrs. Too many & it is soon going to have to be over. (You are welcome to shoot any of them, but let [Ms. Groover's] body be found-we have life ins on her so may as well collect it…I know that sounds mean for a mom to say,but she hates me, wants me dead as well as dad & Jen.)

"'Mom Barbara" continued, "Thanks for fighting for Bud & the ID-it's time for the talk to be over-he is ready for action (you know what I mean).. he can leave me now and do whatever they want."

An email sent from Jenelle's email account to Defendant's email account on April 5, 2011, contained a Facebook message from "Chris" to "Barbara." "Chris" expressed outrage about the order of protection Mrs. Osborne tried to obtain against Jenelle and stated "[t]hey better not ever put either of you in jail." "Chris" wrote that he had a new boss but that he would try to get someone to call Buddy, explaining that Buddy was "in the computer they can look him up and he comes up CIA so he can be called for anything." In another Facebook message from April 2011, "Barbie" updated "Chris" on the order of protection hearing and daily events in the Potters' life. As part of her update on the harassment, "Barbie" noted, "Bud[dy] doesn't threaten; he does . . . ya know. lol[.]" In the same message "Barbie" wrote,

they need to back off. **Bud[dy] is sooooo mad, &I'm 100% behind whatever happens. You guys meet when you are ready Chris. Maybe Bud will have ID by then & can use CIA guns, etc. for his protection-get the jobs done. ya know. They all need to go & the ones left need to be given a big scare as they watch & wonder "am I next?"**

(Emphasis added). "Barbie" urged Chris to "[k]eep scaring up these 3 girls w/guns,etc.&breaking their cars . . . . Make things hard for them bc they are making life hard for us."

"Chris" responded to "Barbie" in a Facebook message on April 16, 2011, writing that "Mike"[6] was bad news and that he could not wait to kill Mike. He then said, "Next is lindsay and [Victim Hayworth] and [Victim Payne] and then cops i want to get." He also referenced the CIA ID and informed "Barbie" that Buddy was "in the computer as CIA and that's all that matters." "Chris" expressed concern about Jenelle's well-being because those "girls have really broke her[,]" and he reiterated that he "will kill them." He informed "Barbie" that he would be in Philadelphia for a week on an assignment but that he had arranged for two trusted co-workers to protect the Potters from harassment.

On April 21, 2011, an email was sent from Jenelle's email account to Defendant's email account with the subject line, "what linsday said." The email appears to contain a copy of an antagonistic email allegedly sent from Ms. Thomas to Jenelle. In the message the writer identified herself as "Lindsay," called Jenelle names, and threatened Jenelle, writing "you're a** is mine your a f***ing b**ch remember that I can get you and will. your daddy cant do sh** to me. I'm above the law dumb f***ing b**ch."

In contrast, "Chris" often referenced Jenelle in complimentary terms in his emails and Facebook messages, saying that she was loving, caring, and a "sweet girl." In a Facebook message dated April 27, 2011, "Barbara" wished "Chris" a happy birthday and commented, "It is amazing that you & Jenelle were born on the same day, same year, 1 minute apart & at the same hospital! you're the same age too. Isn't that quite a coincidence?" "Barbara" continued to update "Chris" on the harassment. "Chris" responded that he would kill Ms. Thomas "and [Victim Payne] then [Victim Hayworth] for sure. Then cops." He then wrote,

**Well buddy can kill them before they will so no worries there.** Dumb b**ch ho. She needs her butt kicked good and left. **And maybe run over and a bullet in her head. Then she would be a dead pan whore face**

---

[6] Based upon the entirety of the email exchanges, it appears that "Mike" was Mike Reece, the Johnson County Sheriff at the time.

**b\*\*ch. LOL Karma it will come back on her. I hate everyone one of them. LOL.**

(Emphasis added). "Chris" also continued to assure "Barbara" that Buddy was "in the computer."

An email dated May 10, 2011 that was sent from Jenelle's email account to Defendant's email account contained a Facebook message posted by "Chris" to "Barbara." In the message, "Chris" provided "Barbara" with Ms. Thomas's schedule and expressed frustration over the ongoing harassment. He stated, **"<u>I wish I [k]new someone that would kill her while I'm here.</u> But if you want [to] kill her and nothing will be asked for sure. I mean a missing person is a missing person."** (Bold added). Later in the message, "Chris" expressed his concern about the possibility of Jenelle's going to jail and committing suicide as a result. He then offered that everything would "be alright," concluding "<u>I'm sure Buddy is on top of everything</u>."

An email sent from Defendant's email account to Defendant's email account on May 12, 2011, contained a copy of a Facebook message to "Chris" from "Barb." "Barb" updated "Chris" on how people at the sheriff's office were being "mean" to Jenelle and asserted that Buddy was "going to see commissioner near us & Larry, mayor, tomorrow." She recounted other acts of harassment that now included acts toward Jamie. She expressed fear that their homes would be set on fire. "Barb" expressed her wish that "Chris" would call Buddy because "Bud-he's ready [] for you."

On June 1, 2011, Facebook messages between "Chris" and "Mom" were emailed from Jenelle's email account to Defendant's email account. "Chris" wrote instructing Buddy to speak with "a state cop" regarding Ms. Thomas because "they will put her in jail up there for calling him and bugging him and what not." "Mom" responded by updating "Chris" on the latest acts of harassment and stated that Jenelle was "constantly threatened and [was] not well at all." She wrote:

> **If you come back, do you have 'plans'? like talked about before for her espec. And for others? I hope they will let you do what needs to be done, and Bud is ready to help you.** Though he needs an ID, he says in this town, they only look at the computer. **He has thought and thought of ways & is ready . . . just needs another guy.**

(Emphasis added).

An email sent from Defendant's email account to Defendant's email account on June 21, 2011, contained copies of Facebook messages with the subject line, "Barb's 2nd

- 32 -

note to Chris(Lance)-re: Jamie, etc. waiting for answer[.]" In the Facebook message, "Barb" wrote to "Chris" about Jamie in a more positive light for the first time:

> *Anyway, a note to let you know this…. I called Jamie this evening & talked for a while, then Bud talked to him. He is coming here on Thurs at noon to see us/talk for a while…so will try to tell you some in 'code' but he can tell you All –if he wants to.

"Barb" also questioned why "Chris" had never called or met with her and Buddy and stated, "*I can't imagine why you are so-o-o afraid of your bosses & 'other' ppl here bc thats just not right [] It just isn't. U'reBosses are not professional at all & are conducting themselves badly, so they, along with you all, could 'lose face' here in this town[.]" Later in the message she wrote, "***I dread the future w/[Victim Hayworth], so hope she won't go after [Jenelle] (& us) next** – w/the baby due soon, she should be concentrating on that, but she's not! Amazing to me!*" (Bold added).

A June 30 Facebook message exchange between "Barb" and "Chris" was copied and emailed from Defendant's email account to Defendant's email account on July 11, 2011. In the messages, "Barb" complained to "Chris" that Ms. Groover told Ms. Thomas and Jenelle that Buddy was weak because "I tell him what to do." She shared her concern that Jenelle would likely be going to jail following the phone harassment trial and that, if Jenelle did not, "Barb" believed that Victim Hayworth and Ms. Thomas would lodge additional legal complaints. She wrote about the corrupt nature of local law enforcement and inquired about the possibility of Buddy meeting with "Adam," one of "Chris's" CIA colleagues. In closing, she noted, "Bud will call Jamie."

"Chris" responded with the following:

> I know Jamie said he was so sorry about all of that stuff. but he said you were always good to him and his mom. and he said nothing bad about any of you all at all. He's just mad about how they are buging You all and Him and he wont take it. He would kill her if he had someone he siad. He know's some ppl that would help him but he said trusting someone you know. He don't want anyone to talk. **But yes i think if he and buddy would meet it would be a good thing.** Before July 27th and let him tell you how he found out everything and he know's them girls was well so he can pretty much tell you if your going to have any isssues with [Victim Payne] or [Victim Hayworth] next and he know's a lot. But i can understand. But please just talk to him.

- 33 -

(Emphasis added).   After writing about his own health concerns[7] and his work, "Chris" returned to the topic of the harassment:

> I'm not sure what [Ms. Thomas] and her boyfriend are up too and her Dad is not a man to mess with.  But i still think buddy can take him down if he had to come to that.  **Now i know why ppl take care of there own issues with ppl kill them and no one cares.**  pretty much.  I have head it and seen it for my self.  I got ride of 2 and no one cared nor asked anything.  lol**. you can get away with it.  She needs to be killed and [Victim Hayworth] and i don't care if i killed that baby and her b/c she going to make it into her.**  Who wants that s**t f**king a**hole's and whores. makesme so sick.

(Emphasis added).

In Facebook messages posted July 2, 2011, "Barbie" apologized for the length of her prior messages and explained that she "just got carried away" because she was "stressing, praying and am just plain concerned about so much!"  She wrote to "Chris" that Buddy "wants us to get out of here," but she did not think that moving was an option for financial reasons and because she and Jenelle needed to be "near Good medical care."  She inquired about "Chris's" medical conditions and relayed her own and Jenelle's medical issues.  She then updated "Chris" on Jamie as follows:

> **About Jamie, yes, everything's okay with us about way back then.  We don't dislike him in any way.  Bud really wants to meet with him but he thinks he works all the time.  I told him to give him a call and meet him out somewhere or over his house.  It needs to be done asap.  He says he will. He has been worried about me bc I've been so bad w/pain, but I told him not to worry bc sooner or later, things will get better at least I'm praying for that.  So he will meet with Jamie, I'm sure, before 7/27!--hopefully he will be able to talk to our lawyer &possibly go to court w/us to speak if lawyer says so.  We'll pay him.  Bud wants to meet w/him . . . he just kind of thinks that Jamie can't help him w/anything,ya know, like he'd like,so he don't know if info would do him any good.  He is upset that if Jen goes to jail-ya know [] & then when [Victim Hayworth] starts on Jen after court in addition to [Ms. Thomas] again . . . we just need to get away from it.

"Barbie" wrote further:

---

[7] In his emails, "Chris" revealed that, like Jenelle, he too suffered from diabetes.

**No, I don't think anyone would really mess w/Buddy. No one has seen the 'other side' of him – not in this town. He always comes across as a gentleman, but he know lots of stuff-ya know to do and say to get things rolling right. He's trained to rock n' roll..ya know. The time will come he thinks&he has thought it out.** I'd love to say more, but better not here . . . the reason he wants to meet w/you.

. . . .

**\*I'm glad that Jamie is really mad & if he feels like Bud, they may take care of some things pretty good.** We all need peace in this place till we move away. I hope they meet soon...we don't know if he's around this next weeks or not or working every day, so have to call.

(Emphasis added).

On August 4, 2011, an email from Jenelle's email account was sent to Jamie's email account with the subject line "Re: me." The content of the email appeared to be more Topix postings that began on August 1. The participants were "Dan White" and "Matt Potter" with one post from "Mike Dunn" and one post from "Brandon Icenhour." The general substance of these posts was strikingly similar to the prior posts, although the threats of violence had escalated. Mike Dunn posted:

I'm about to fight with you [Victim Hayworth] why dont you shut up your f***ing month you B**ch. One day girl you are going to get beat up really good andleft for dead. You better sut up you b**ch. Go f*** a cow for all i care. Damn hooker, slut bag whore . . . . And your Basterd baby take it with you and leave this f***ing town. You wont leave here alive.

Matt Potter posted a response that read, "Damn Mike what she do go after your wife??? Damn i think we just need to gut her and leave her for dead and kill the damn f***ing whore." He also issued a threat to Victim Hayworth writing, "[Y]ou're a f***ing no good person [and] your day is comeing." In regard to Victim Hayworth and Ms. Thomas, Dan White posted, "[I] hope you all get raped and killed for what you did."

On October 9, 2011, an email from Jenelle's email account was sent to Jamie's email account with the subject line "this is from linsd[e]y from c." The bolded message read:

**Your a f\*\*king B\*\*ch and you know your f\*\*\*ing a\*\* is going to jail and [Victim Payne] is going to kill you he has said that and i hope he**

- 35 -

**does.  None of us want you around nor living.  Your a wasit of air and time on everyone.  You are nothing.  You really think you are sweet and smart HAHA yeah right your dumb and your very ugly no one wants you.  [Victim Hayworth]  thinks your fat and [Victim Payne] Me F\*\*king linsday i just hate you're a live.  you will die b\*\*ch and i cant wait to see it.  go to Hell b\*\*ch.**

On October 25, 2011, a series of emails were exchanged between "Chris" and Jamie.  The initial messages were brief and concerned Jamie going to see Jenelle, who was "sad."  Jamie wrote that Jenelle "need[ed] a break from here" and that he wanted "to make her happy an[d] give her p[ea]ce of mind."  "Chris" responded in an email sent from Jenelle's email account, writing:

> yes man I'm with you 100% she loves you so much and miss's you alot.  I know she is not fine look at the poor thing and it's sad they are doing this to her life and she has been sad i new it and she just said i will talk to Jamie about it and how sheloves you and she told me not to worry but she has been real down and no one shouldhave to live like this[.]

Jamie then sent "Chris" the following email:

> no they shouldn't an def[initely] not her she is to[o] good of a girl to have to put up with this sh\*t an[d] man words can't start to say how much i love her i see the love she has for me an[d] that[']s something i thought i[']d never see not from this sh\*t hole but she is my ray of light at the end of the tunnel

On October 27, 2011, "Chris" emailed Jamie again, writing:

> Hi Jamie
> It's Chris, I wanted to say hello and I thank you for being there for Jenelle and Her Mom and Dad.  They are good people and what others say about them is wrong.  I know you have taken up for Her family and her.  It means a lot to me.  Well Anyways I hope you all can get her out on saterday and also you can still do what you wanted.  Make sure you have Candles and make sure you have a card and make the bed really pretty and just love on her.  Thank you for being the one there for her.  She need's you in more way's then one.  she is a wounderful sweet careing girl.  She would do anything for anyone before her self.  But i know you know this about her.  She is a good person.  These's girls are just driving her so crazy and you know they are crazy.  But what they are doing is still f\*\*king wrong and

- 36 -

hurting her like they are. There is no reson for it. Just b/c she is sweet and very pretty prettyer then them. They need to get over it. They just love to pick but from what i know. This Demon thing came to us from them. I think it really came from Linsday and [Victim Payne] from what I'm hearing and learning from. It's waiting on him and something will happen to them in time. **With you and Buddy I hope you all can get them. I hope it all works out great. I hope that you will pray about it and Buddy is and that you know what you are all doing is great. Your going to help the town.) wish i could kill them but right now i really can't.** But anyways I'm so happy that you and Jenelle are happy together and love each other so much. Have Lori call Jenelle and ask her to go out on saterday. thank you. But pray for Jenelle i know she is having a very hard time and she just needs someone like you and I'm so happy and blessed she has you. Well take care dude and I love ya. You are my brother and thank you for being a true blessing to my Sister. Take care and God Bless
Chris

(Emphasis added).

Several more emails were exchanged on October 30, 2011, with "Chris" detailing the harassment and its effect on Jenelle, *i.e.*, "it's going to kill her," and how much Jenelle loved Jamie. Jamie then responded, expressing his devotion to Jenelle and his frustration with the circumstances. He also shared that he was intimidated by Defendant and Buddy, but "Chris" assured Jamie not to "worry about" Defendant. "Chris" coached Jamie on how to find favor with Defendant by showing Defendant how much he cared about Jenelle and calling and talking with Defendant.

On October 31, 2011, "Chris" sent an email from Jenelle's email account to Jamie's email account with the subject line "Hi Man." "Chris" began the message with, "I can't say everything[,]" but "[Ms. Thomas] and [Victim Payne] and [Victim Hayworth] are going to get there pay back for what they are doing to Jenelle." "Chris" continued:

> **Jenelle is just at her end and from what [Defendant] say's all of this is getting to her so bad and she is worryed about Jenelle. But i think more you hang out and everything with them and then you and Jenelle alone it will all be ok you know. Man i have our back always** and Jenelle never been happy or loved like you give her and she loves you and want's you and need's you and will always be happy and loved by you.

- 37 -

(Emphasis added).

The following day, an email was sent from Defendant's email account to Jamie's email account, in which "Barbara" discussed "all that junk on [T]opix[.]" She stated that she was "highly pissed" about the "hurtful[] lies." "Barbara" wrote, "[B]ut good ol Chris went after them big time as 'Matt Potter' and he [told] them off something awful." "Barbara" stated that the Topix postings were making her sick and were upsetting to Jenelle. "Barbara" warned Jamie about Victim Payne and Victim Hayworth, writing:

> I feel bad for you bc how they run you down, its terrible. You are not the bad person they li[ ]ke to say you are . . . they even told the police last year that you were in trouble & bad & to keep you away from our house! []so you see? Can't trust [Victim Payne] or any of them. I feel bad for you. <u>Know this. You are Not alone</u>. We are here and we care bout you a lot.

"Barbara" referred to the victims as "the Evil ones" and accused them of "work[ing] on the edge of the law." She told Jamie, "**I know they think that I'm a little sweet lady who won't do anything but just smile and be nice to them, never carry a gun, but they are dead wrong . . . . I hide my anger and readiness well my dad and buddy have trained me well.**" (Emphasis added).

On November 1, 2011, an email was sent from Jenelle's email account to Jamie's email account with the subject line "more about Jen LOL." The body of the email contained "Matt Potter's" postings on Topix. The postings made numerous references to the writer's hope that the victims and their friends would "f***ing die and go to[]hell[.]"

On November 7, 2011, "Barbara" sent an email from Defendant's email account to Jamie's email account with the subject line, "HI – ITS BARB – ONE MORE FAVOR FOR ME/BUDDY?" "Barbara" provided Jamie with a history of the conflict in her family. She asked Jamie for more help with their computer. Specifically, she asked Jamie to remove all of Jenelle's postings on Topix. "Barbara" wrote that Jenelle "had a bad evening," attributing harassment by Ms. Thomas as the cause.

"Chris" continued to email Jamie, updating him on various acts of harassment and expressing anger over the pain it caused Jenelle. In one email, "Chris" thanked Jamie "for watching over my Family," reiterated how much Jenelle loved him, and encouraged Jamie to "Hack." In a November 10, 2011 email to Jamie, "Chris" wrote, "**I can't wait for you and Buddy and us to do our Job's.**" (Emphasis added).

On November 16, 2011, an email was sent from Defendant's email account to Jamie's email account with the subject line, "Hey Jamie – Weds . . . . . 11/16/11 ---- READ ASAP." The bolded message from "Barbara" read,

**Hi Jamie -**
**Thanks for all of your help and support thru this thing. We're all tired but up. I'm getting a shower and laying back down - unless end up getting Jen something or to the ER/or hospital w/her.**

**\*\*I just wanted to tell you that I looked at Your Facebook account to see if Lindsey said anything to you at all and your comment to her is Gone! You might want to go into it again -- <u>jackwright94yahoo.com</u> is your email and your password is "<u>mexall</u>"**

**Just <u>go into Facebook</u>(thru typing it on search line on google or yahoo), <u>then type in your email and password</u> (see above), enter, & you're into <u>your own FB-facebook page</u>--Jack Wright's. []**

**Then <u>on the search line at top of Your FB page just type in Lindsey Thomas</u> and she comes up. I looked at her page, but <u>don't see any mail from you to her may have to try again....</u>**

**. . . .**

**\*I did write to Chris earlier and tell him to never use last names on facebook but the ones he wrote in the other night <u>he has already deleted anyway (but they'll show up in cookies; right? right)</u> ..but [Victim Payne] has a copy/pic of that screen now anyway so he will go after Jen for that & lots of other things that are in his little brain I'm sure. They are all 'fixated' on Jenelle, and/or us! grrr But anyway, its Chris that is putting their whole names on, not Jenelle. He added another topic on Topix called, Lindsey Thomas, Lindsey Potter and [Victim] Hayworth - and is telling them off again--you can see it . . . . I know [Victim Payne] thinks that this is all Jenelle, or us, doing this - but its Not and I explained it all to Chris anyway.**

**Jenelle is very sick, throwing up and shaking today, so it doesn't look good. She may end up at the hospital again, but <u>Buddy will Still be around for later on.</u>**

**I'll talk to you later.**

- 39 -

**Thanks again.**

**Barbara**

On November 23, 2011, "Barbara" sent an email from Defendant's email account to Jamie's email account with the subject line, "Hi Jamie – from Barbie --------About our phone call today 11/23/11." In the email, "Barbara" referred to their phone conversation, wherein she told Jamie about recent communication with "Chris." She indicated that "Chris's" Facebook message to her was pasted into the email. In his Facebook message, "Chris" warned "Barbara" about Victim Payne's and Ms. Thomas's plan to "get Jenelle in jail[.]" "Chris" wrote that Victim Payne was "doing a lot behind J.s back." "Chris" instructed "Barbara" to "[l]et J know this bc he is after him big time . [Victim Payne's] always back stabbing and he's been doing this to J for more then just 2 years. J has no idea." At the close of her email, "Barbara" told Jamie that he should call and speak to her or Buddy "about 'things' anytime" and stated that Buddy was "'stuck' about what to do now[.]" "Barbara" continued, "But it sounds like [Victim Payne] has been after you for years before you knew us at all!" She then expressed concern over the possibility of Jenelle's going to jail and what "a scary time" the Potter family was going through. She wrote, "They are trying to kill Jenelle little by little (but doc says that at this rate, it could happen anytime w/heart attack/stroke, DKA itself-that she is getting it too often now & the stress has to stop)." "Barbara" stated that the victims would not stop "until we're all dead/gone" and that "the cops are behind [the victims] and [Ms.] Thomas per Chris." She further wrote, "**By the way, If you talk/text with Chris,ask him if he thinks the cia will back up Buddy if he takes it into his own hands**." (Emphasis added).

On December 6, 2011, an email was sent from Defendant's email account to Defendant's email account with the subject line, "SEND LATER – WHEN WILL GO THRU –TUES, 12/6/11." The email contained a message from "Barbara" to "Chris." In the email, "Barbara" wrote:

> So [the victims] may as well accept the loss and go on w/their lives be they are Not going to get Jenelle. there is no way. Between our heavy quantities of ammo and protection of her at all times and your all's they are going to get the surprise of their lives. And as far as J goes, he's safe and he knows it. He don't want to be messed with and he is heavily armed and ready thanks to dad. lol so let them try to get to him.

She warned that "**if someone wants to bring it on, they will All die, including the baby.**" (Emphasis added). She said that Jenelle was not afraid and that the victims and their friends "better think twice if they want to live any longer[.]" "Barbara" wrote

disparagingly about Victim Payne and Victim Hayworth and mentioned the incident that occurred after court at the convenience store, explaining that Buddy "was going to fight and kill [Victim Payne], had it in his mind plan-ready to go" but that Victim Payne had "backed down[.]"  "Barbara" then asked "Chris," "So you think that it will be in a week or so – things will be happening – we are thinking different/sooner..and ready . . . well we will see – it may be sooner than anyone thinks."  "Barbara" continued, "[W]e want peace and no one here wants to kill anyone, but we will."  "Barbara" further wrote that Buddy was "**trying to be patient for the 'right time' but now, he says the Time is Has Come**-whenever now! -and If they want Jen so bad they can't stand it, then come on! and **they will breathe their last breath..bud is soooo ready, we all are**."  (Emphasis added).  She wrote about the local law enforcement being "useless," that she carried two guns, and that she would do whatever she had to do "to save my kid or myself."  She stated that she did not call 911 anymore because "**we are ready to take care of this ourselves, espec. Bud and Jamie are super ready all the time**."  (Emphasis added).  She stated that she told Buddy and Jamie that "Chris"

> said that their backs are covered well and that all is good--but dad knows that but says that he will do whatever it takes no matter whose around, but all is okay anyway& thanks . . .we never know if you hear all, see all or not, but we're all ready.  They are glad cia is around but they say that they will be able to handle it all but good to know.

"Barbara" compared herself to a mother lion, writing "I'll do whatever it takes to save my young!"  She threatened, "**I will kill if I have to, not just hurt but kill**."  (Emphasis added).

On December 12, 2011, an email was sent from Defendant's email account to Defendant's email account with the subject line "PRINT –Messages fr/to Chris-week of December 4, 2011-them harassing, etc."  In one of the copied Facebook messages, "Chris" warned:

> But round 3 is [Victim Payne] wants to hurt Jenelle or just yell at her he has not made his mind up yet.  from the phone call's there are a lot of guys looking for Jenelle and know's her now.  and She will be fine like I said she never alone.  They are wanting to hurt her for many reasons.  But it will be ok.  as you know what I mean.

"Chris" also wrote, "Please tell J and B it's ok and we have there backs and to just make you and Jenelle safe[.]"  In another communication from "Barb," she wrote that "**Anyone who wants to mess with Jenelle or w/us is Asking to die!**"  (Emphasis added).  She then referred to the victims and their friends as "a bunch of druggies, dumb asses, evil

satan worhsippers who have no brains for anything but harassing ppl & evil plots. They are not even ppl – they are monsters w/names."

On December 14, 2011, an email was sent from Jamie's email account to Defendant's email account. The email was signed "Jamie" and stated that he hoped "[Victim Payne,] [Victim Hayworth,] and Lindsey will get whats coming to them[.]" An email was sent from Defendant's email account to Defendant's email account on December 16, 2011, with the subject line, "112/15/11 - 11:59 pm to c fr b (after thurs nite try) print/read later[.]" In what appears to have been a copy of a Facebook message posted by Defendant to "Chris," the writer questions, "What are your feelings if someone was found w/a hole in them somewhere in a car? have you done this? Would they chk it out or not?"

On January 16, 2012, two weeks before the murders, an email was sent from Defendant's email account to Defendant's email account. The email contained two links: "Can God Forgive a Murderer?, Christian News" and "billy graham-questions about forgiveness & murder – AOL Search Results."

*Defense Proof*

Keith Jones, an expert in computer forensics, testified that he worked for a cybersecurity company and was retained by the defense. Mr. Jones explained that he was provided the report generated by the TBI, as well as a "ghost copy" of the information found on the Potters' computer, which was provided by defense counsel. Mr. Jones requested a "forensic duplication," which Agent Williams subsequently provided to him. Mr. Jones agreed that defense counsel had not asked him to run a complete forensic computer analysis of all the data on the Potters' computer, and he noted that no such analysis had been conducted by investigators working on behalf of the State. Mr. Jones testified that, in conducting a forensic computer analysis, he could see the activity on the computer, but he explained that it was "very difficult" to determine the identity of the particular user who generated the activity. He explained that such a determination would require numerous "different data points[,]" which were "a whole list of different things that had to either be known by an individual, or was accessible by an individual." When asked how many data points he would need to tie an individual to a computer's activity, Mr. Jones responded, ". . . I cannot give you a number [] because it varies per case." He continued, "What happens is you start by saying this could be anybody that created this traffic and you collect enough data points to . . . make that population shrink until finally you're down to one individual without a doubt that made that activity."

Mr. Jones noted that there were email messages from Jenelle and Defendant's AOL accounts that contained the passwords for AOL and Facebook accounts in the body

of the messages. Mr. Jones stated that because email messages are not secure, some third party could have "pick[ed] up that password" and had access to those accounts. Mr. Jones testified that he found malware on the Potters' computer but that he did not analyze the malware because it was "outside the scope of what [he] was asked to do." Mr. Jones testified that the presence of malware would further complicate discovering the identity of the individual generating activity on the computer. He stated that someone else could control the activity on a computer through malware.

Mr. Jones testified that the particular IP address found on the email messages from Jenelle and Defendant's AOL accounts was "a private IP address[.]" Mr. Jones further explained:

> [B]ecause there's only so many IP addresses that can be assigned . . . [a]nd since there's so many more computers than there are IP addresses what happens is you might have a network of computers and you don't have enough IP addresses to go on . . . each computer. So, what companies can do is they can make this private network and they're allowed use of ranges . . . to use privately on their network.

Mr. Jones stated that because it was in one of these "ranges," the IP address on the email messages was owned by "[e]verybody and anybody[,]" meaning that "anybody in this room could have sent this email . . . ." Mr. Jones stated that the IP address "could belong to anybody in the world" and could be "assigned to any number of computers." Mr. Jones noted that Century Link, as the Potters' internet service provider, could give investigators "subscriber information" as to "who had this IP address at a particular time[,]" but he reiterated that an IP address was "not a single computer" and, instead, could be assigned to many different computers. He opined that, even if an IP address were to point to a particular house, there would still be additional work to be done to determine the identity of the user generating activity on the computer.

On cross-examination, Mr. Jones testified that he was not given the original disk of email messages provided to the State by AOL pursuant to a search warrant. He stated that he was only tasked with getting a "general sense of what's on the [Potters'] computer[.]" He did not attempt to identify the authors of the email messages. Mr. Jones agreed that, if an IP address was assigned to the Potter residence by Century Link on a particular date, there could not be "fifteen other computers on their block . . . using the same IP number[.]"

Following deliberations, a jury found Defendant guilty of two counts of first degree premeditated murder, one count of conspiracy to commit first degree murder, and one count of tampering with evidence. At sentencing, the trial court merged the

conviction for conspiracy to commit first degree murder into the two convictions for first degree premeditated murder and imposed concurrent life sentences for those offenses. The trial court sentenced Defendant to three years for tampering with evidence and ordered that sentence to be served concurrently with Defendant's life sentences. Defendant's judgments of conviction were entered on July 7, 2015.

Defendant filed a timely motion for new trial on August 3, 2015. Following a hearing on October 28, 2015, the trial court entered a written order denying the motion for new trial. Defendant then filed a timely notice of appeal.

On July 12, 2016, Defendant filed her appellate brief with this court, along with a motion requesting that the court stay the direct appeal so that Defendant could pursue a petition for writ of error coram nobis, which she filed with the trial court on July 7, 2016. On July 13, 2016, this court entered an order staying the direct appeal pending the disposition of the petition for writ of error coram nobis. On February 7, 2018, the trial court clerk transmitted to this court a copy of the trial court's order denying the petition for writ of error coram nobis. Accordingly, on February 9, 2018, the court entered an order vacating the stay, and Defendant's direct appeal follows.

## II. Analysis

### A. Location of change of venue

According to Defendant's brief, Defendant filed a motion for change of venue prior to trial, arguing that "unfair and Inflammatory Pretrial Publicity" had "permeated the viewing area of both WCYB and WJHL, and the readership of both the Elizabethton Star and the Johnson City Press" and alleging that the prosecutors and law enforcement had participated in the release of the inflammatory publicity.[8] The trial court granted Defendant's motion, moving the trial from Johnson County at Mountain City to Washington County at Jonesborough, some fifty-one miles away. In its order, the trial court noted that counsel for the defendants had "until January 2, 2014 to file affidavits in support of their request that the venire be selected from some county located outside of the 1st Judicial District." Following a hearing on January 8, 2014, the trial court entered an order denying the motion to change venire.[9] In denying the motion, the trial court reasoned:

---

[8] The record on appeal does not contain a copy of Defendant's motion for change of venue.

[9] Defendant subsequently filed a motion to reconsider change of venire in March 2014. The trial court apparently denied this motion, but the record does not contain an order or minute entry disposing of it.

- 44 -

I'm sensitive to the amount of publicity that the case -- that the original case, State versus Marvin Potter, caused in the previous case. What the court is going to do, and I'm still sensitive to the amount of publicity and I'm also aware that -- that this case may generate more publicity between . . . now and the time we set it simply because of this is an election year. I'm going to deny your motion at this time, but I'm going to do two things and that is, I will try to monitor myself the additional publicity that this case gets. I regularly -- since I come up here so often I regularly pick up the Johnson City Press off of the internet and so I usually am able to keep up with what's going on in this county. And, secondly, if we decide that we wish to proceed in this county, . . . which is the order of the court at this time, that if it appears from the initial voir dire that this case generated much more publicity than I think then I'll have no hesitation to re-examining my ruling and then just re -- and then getting a new voir dire at a later time. So, at this time your motion is denied, but I -- I guess what I would say is, I'll reserve it pending the amount of publicity that's generated between now and trial time, as well as my own invest -- well, my keeping up with the news accounts of that that occur between now and that -- and a trial date.

Defendant contends on appeal that the trial court erred in moving the venue of Defendant's trial to Washington County. Defendant argues that the case received a voluminous amount of press coverage and that Washington County remained within the WJHL and Johnson City Press coverage area. She asserts that because Washington County remained within the area of publicity, the trial court was required to change the trial venue to a county outside of the judicial circuit. The State responds that Defendant has waived any issue about venue based on her failure to raise the issue in her motion for new trial and her failure to include a transcript of voir dire in the appellate record. The State further contends that plain error review is not warranted. We agree with the State.

Defendant did not raise this issue in her motion for new trial. Tennessee Rule of Appellate Procedure 3(e) states "that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence[] . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). We determine that Defendant has waived consideration of any issue relating to venue by failing to include the issue in her motion for new trial.

- 45 -

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Here, Defendant is not entitled to plain error relief because the record does not clearly establish what happened in the trial court, and Defendant has not demonstrated the breach of a clear and unequivocal rule of law. Before a defendant is entitled to a reversal of her conviction on the ground that the trial court denied her motion for change of venue, the defendant must demonstrate that the jurors who actually sat in judgment were biased and/or prejudiced. *State v. Burton*, 751 S.W.2d 440, 451(Tenn. Crim. App. 1988). Defendant has not included the transcript of voir dire in the appellate record. Without that transcript, this court must presume that the jury empaneled to sit in judgment of the defendant was fair and impartial. *Id.* at 451-52. Defendant is not entitled to plain error relief.

### B. Denial of motion for lead prosecutor to withdraw

Defendant next contends that the trial court erred in denying her motion for the lead prosecutor, Assistant District Attorney General Dennis Brooks, to withdraw from the case. Defendant asserts that, during the pendency of her trial, General Brooks "campaigned for the position of Criminal Court Judge, Part I" and that prior to trial, in February 2014, Ms. Groover submitted a Letter to the Editor of the Johnson City Press, in which she endorsed General Brooks in his campaign. Defendant notes that the letter indicated a friendship between General Brooks and Ms. Groover; Ms. Groover referred to General Brooks as "Dennis" and stated that she had been working "with Dennis on a criminal case in which he was the prosecutor" and that "Dennis prosecuted [her] father." Defendant asserts that General Brooks posted Ms. Groover's letter on his campaign's Facebook page, which "heighten[ed] public condemnation of the accused[.]" Defendant contends that the actions of General Brooks were "highly improper" and that the trial court should have ordered his withdrawal from the case. The State responds that any issue about the denial of a motion for the lead prosecutor to withdraw is waived based on

Defendant's failure to include the issue in her motion for new trial. The State further contends that Defendant is not entitled to plain error relief. We agree with the State. By failing to include this issue in her motion for new trial, Defendant has waived plenary review of the issue. *See* Tenn. R. App. P. 3(e), 36(a).

Moreover, Defendant has not established the need for plain error review. In denying the motion for General Brooks to withdraw from the prosecution of the case, the trial court determined: [10]

> The second issue is to whether or not to disqualify General Brooks. This court . . . finds that General Brooks should not be disqualified from hearing this case. . . . I don't find that there are any ethical violations on the part of General Brooks. It would -- now, it would be a different story altogether if the proof was that General Brooks in some -- some capacity solicited this lady. I have had a case in -- involving a person -- a judge running for re-election in which he solicited a let -- a letter of approval from an individual involved in a -- on a ongoing court case, and that is certainly an ethical violation. But, we have no proof to indicate that this letter that Ms. Groover chose to write in the -- in the -- or, send to the Johnson City newspaper was in any -- any way solicited by General Brooks. Absent that I don't think there's any reason we should -- this court should find that General Brooks is disqualified to -- to -- or, to participate in this case.

In support of her argument, Defendant cites Tennessee Supreme Court Rule 8, RPC 3.8, which states in relevant part that a prosecutor in a criminal case, "except for statements that are necessary to inform the public of the nature and extent of a prosecutor's action and that serve a legitimate law enforcement purpose, shall refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused . . . ." Tenn. Sup. Ct. R. 8, RPC 3.8(f). However, having reviewed Ms. Groover's letter, nothing contained in the letter was so negative or specific as to incite public condemnation of Defendant. While the letter was complimentary of General Brooks, it made no mention of Defendant or co-defendant. The ordinary reader of the letter would have no way of knowing that Ms. Groover had any connection to Defendant's case. Moreover, even if Ms. Groover's letter amounted to a violation of Tennessee Supreme Court Rule 8, RPC 3.8(f), Defendant has cited to no authority for her claim that such a violation would require General Brooks to withdraw

---

[10] We note that Defendant's record on appeal does not contain transcripts of two pretrial motion hearings but that the transcripts are contained in the record from co-defendant Jenelle Potter's direct appeal. To assist in the resolution of Defendant's case, we have taken judicial notice of that record. *See* Tenn. R. App. P. 13(c); *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009); *State ex rel Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964).

from the case. Because there was no breach of a clear and unequivocal rule of law in the trial court's refusal to require General Brooks to withdraw from the case, Defendant is not entitled to plain error relief. *Adkisson*, 899 S.W.2d at 640-41.

## *C. Denial of motion to pre-emptively strike a witness*

Defendant also asserts that the trial court erred in denying her motion to preemptively strike Ms. Groover's testimony. Defendant argues that, based on Ms. Groover's relationship with General Brooks, her testimony on behalf of the State "created an unfair and inflammatory environment" and made it impossible for Defendant to receive a fair trial. The State responds that Defendant has waived the issue by failing to raise it in her motion for new trial and that Defendant is not entitled to plain error relief. We agree with the State.

Although Defendant filed a timely motion for new trial, she did not raise this issue in the motion or in an amended motion for new trial. As previously noted, "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence[] . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). Additionally, appellate relief is not required to be granted "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). We conclude that Defendant has waived our consideration of the trial court's denial of the motion to pre-emptively strike a witness by failing to include the issue in her motion for new trial.

Plain error is not warranted because there was no breach of a clear and unequivocal rule of law. *Adkisson*, 899 S.W.2d at 640-41. In denying the motion to pre-emptively strike Ms. Groover, the trial court found:

> Surely, she can be -- if she has any bias in this -- in this matter, she can certainly be cross[-]examined as a result of this position that she has taken with regard to this letter. And, certainly, she is -- she has opened herself for her -- for her creditability to be attacked as a result of this. And I'm sure that if she does testify I'm not certainly not going to limit you to -- you'll certainly be able to cross[-]examine her with regard to whether or not she has any prejudices, or whether she has any motive, or she has any bias with regard to [the prosecutor] . . . or the [S]tate in this case.

As noted by the State, Defendant cites to no authority that a relationship between a prosecutor and a witness creates a basis to strike that witness. Tennessee Rule of Evidence 601 provides that "[e]very person is presumed competent to be a witness except

as otherwise provided in these rules or by statute." Tenn. R. Evid. 601. Additionally, Tennessee Rule of Evidence 616 allows for the impeachment of biased witnesses through cross-examination and/or the admission of extrinsic evidence. Tenn. R. Evid. 616. In this case, following Ms. Groover's testimony on direct examination, Defendant's counsel cross-examined Ms. Groover about the letter she wrote in support of General Brooks's political campaign. The trial court also permitted Jenelle's counsel to cross-examine Ms. Groover further about her relationship with General Brooks and his wife. Defense counsels' lengthy cross-examination of Ms. Groover adequately attended to the concerns of Ms. Groover's potential bias. Accordingly, there was no breach of a clear and unequivocal rule of law underlying the trial court's refusal to exclude the witness.

### D.     Sufficiency of the evidence

Defendant contends that the evidence presented at trial is insufficient to support her convictions for two counts of first degree premeditated murder, conspiracy to commit premeditated first degree murder, and tampering with evidence. The State responds that, when viewed in the light most favorable to the State, the evidence is sufficient. We agree with the State.

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982)). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, because they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. *Bland*, 958 S.W.2d at 659. This court will not reweigh the evidence. *Id.* On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

## 1. First degree premeditated murder

As relevant here, first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2012). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2012). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2012). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.* Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Moreover, there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id.* Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003) (citing *Suttles*, 30 S.W.3d at 261; *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

The jury in this case was instructed on criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2012). As pertinent here, a person is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2012). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). "[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *See State v. Maxey*, 898

S.W.2d 756, 757 (Tenn. Crim. App. 1994); *see also State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

In challenging her convictions for two counts of first degree premeditated murder, Defendant asserts that the State failed to establish her identity as a perpetrator of the offenses. The identity of the perpetrator is an essential element of any crime and may be proven by circumstantial evidence alone. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The weight to be given to circumstantial evidence, the inferences to be drawn from such evidence, and "the extent to which the circumstances are consistent with guilt and inconsistent with innocence" are questions for the jury. *Id.* (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

When viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's convictions for two counts of first degree premeditated murder under the theory of criminal responsibility. The evidence demonstrates that Defendant, acting with the intent to promote the commission of the offenses, solicited, directed, aided, or attempted to aid Buddy and Jamie in the commission of the murders. The State presented evidence that, on the morning of January 31, 2012, Buddy and Jamie entered the victims' residence armed carrying guns and a knife. Buddy shot the two unarmed victims in the head, killing them, and either Buddy or Jamie cut Victim Payne's throat with the knife. When confronted by investigators, Buddy admitted to his involvement and said that he had killed the victims to protect Defendant and because of what the victims had tried to do to Defendant and Jenelle. Jamie also admitted to investigators that he had assisted Buddy in committing the murders but stated that he had been manipulated into taking part in the murders by "the Potter family."

The State presented evidence that the victims' murders were the culmination of a year-long feud between the Potter family, the victims, and the victims' friends, which played out online and in person and consisted of threats and various forms of harassment. According to Defendant and Jenelle, the victims and their friends posted negative comments about Jenelle online and threatened to beat her up, rape her, and kill her. Defendant told investigators that the victims and their friends "hack[ed] in" to Jenelle's Facebook account and threatened, "We want you dead." Defendant also recounted that they tried to put sugar in the Potters' gas tank, scratched Buddy's truck, broke their garage door, and threw rocks at the house and Jenelle's window. Jenelle told investigators that Victim Payne parked his truck by the Potter residence and shot a gun at the house and that Victim Payne told her, "I'm going to kill you. I'm going to get you at some point." Jenelle also stated that "they" would kill Buddy and Defendant to "get to [her]."

Although Buddy did not use the computer and witness the online threats and harassment personally, the jury could have inferred that Defendant and Jenelle convinced Buddy that Jenelle was the target of harassment and death threats from the victims and the victims' friends. In emails, Defendant wrote that she told Buddy about the threats and harassment and about how much "danger" they were in. Buddy clearly took the threats and harassment seriously as he began sitting up all night long to watch over Defendant and Jenelle. Defendant and Jenelle also convinced Jamie of the danger posed by the victims and their friends, through discussions about "Chris," a CIA agent who they claimed was monitoring the situation with the victims and protecting the Potter family from them. Jenelle told Jamie that "Chris" was a friend of the family and that he worked for the CIA. Defendant also told Jamie about "Chris," whom she referred to as her "son." Around the time the feud began with the victims and their friends, Jamie began receiving text messages and emails from "Chris," in which "Chris" would report about the things people were posting about Jenelle online. "Chris" would "rant and rave about everything" in his emails. "Chris" cursed, called people names, and wished harm on others, and his hatred was directed at Victim Payne, Victim Hayworth, and their friends. Jamie testified that Defendant also kept him informed about the harassment and threats from the victims, and she encouraged Jamie to speak to Buddy and "Chris" about these issues. Jamie testified that Defendant would invite him to the Potter residence and "bring him up to speed on who was emailing what, or . . . what all the bad things that they'd said about Jenelle[,]" and eventually, Defendant told Jamie that the victims and their friends were "trying to add him to the mix." During Jamie's conversations with the Potter family about these issues, Buddy said that he did not understand "why they were doing it" and that he wanted it to stop. Buddy also talked about his missions in other countries, and Defendant explained to Jamie that Buddy had also been in the CIA.

The State also presented evidence that the stress from the Potters' interaction with the victims and their friends, including repeated court dates and the threat of jail time and/or probation for Jenelle, had a serious negative impact on Jenelle's health and that Defendant believed the harassment would not end following the dismissal of the criminal case against Jenelle. Jenelle told investigators that she almost died due to the stress caused by the situation. She explained that she had diabetes and "heart problems" and that the victims and their friends had known that she would get "very sick" under stress. She recalled that, after one court date, she had to be carried out of the courtroom by Buddy and Jamie and hospitalized. Jenelle stated that she also ended up in the hospital after Victim Payne shot at the Potter residence. In an email sent to Jamie on November 23, 2011, Defendant expressed concern over the possibility of Jenelle's going to jail and what "a scary time" the Potter family was going through. She wrote, "They are trying to kill Jenelle little by little (but doc says that at this rate, it could happen anytime w/heart attack/stroke, DKA itself-that she is getting it too often now & the stress has to stop)." Defendant stated that the victims would not stop "until we're all dead/gone[.]" In other

emails, Defendant expressed her concern that, despite the dismissal of the phone harassment charge against Jenelle, the threats and harassment would continue. Jenelle told investigators that a friend of Victim Hayworth's assaulted her after the dismissal of the charge, and Jamie testified about how Victim Payne confronted him and the Potters as they were leaving the convenience store after court. In a Facebook message to "Chris," Defendant wrote, "*I dread the future w/[Victim Hayworth], so hope she won't go after [Jenelle] (& us) next – w/the baby due soon, she should be concentrating on that, but she's not!" In another message written to "Chris" on December 6, 2011, Defendant wrote, "So [the victims] may as well accept the loss and go on w/their lives be they are Not going to get Jenelle. there is no way. Between our heavy quantities of ammo and protection of her at all times and your all's they are going to get the surprise of their lives." Defendant warned that "**if someone wants to bring it on, they will All die, including the baby**." (Emphasis added). She said that Jenelle was not afraid and that the victims and their friends "better think twice if they want to live any longer[.]"

Further, the State presented evidence that Defendant believed local law enforcement would not help the Potters deal with the threat posed by the victims and the victims' friends, that Defendant wanted the victims dead, and that she encouraged Buddy and Jamie to take matters into their own hands. In a December 6, 2011 message to "Chris," Defendant wrote that local law enforcement was "useless," that she carried two guns, and that she would do whatever she had to do "to save my kid or myself." She stated that she did not call 911 anymore because "we are ready to take care of this ourselves, espec. Bud and Jamie are super ready all the time." Defendant continued, "[W]e want peace and no one here wants to kill anyone, but we will." Defendant's emails indicated that she told Buddy he had been reactivated by the CIA, and she informed Buddy and Jamie that "Chris" "said that their backs are covered well and that all is good[.]" In the December 6 message to "Chris," Defendant explained that Buddy was "**trying to be patient for the 'right time' but now, he says the Time is Has Come-** whenever now! -and If they want Jen so bad they can't stand it, then come on! and **they will breathe their last breath..bud is soooo ready, we all are**." (Emphasis added). Defendant also compared herself to a mother lion, writing "I'll do whatever it takes to save my young!" She threatened, "**I will kill if I have to, not just hurt but kill**." (Emphasis added). In another message to "Chris" the following week, Defendant wrote that "**[a]nyone who wants to mess with Jenelle or w/us is Asking to die!**" (Emphasis added). She then referred to the victims and their friends as "a bunch of druggies, dumb asses, evil satan worhsippers who have no brains for anything but harassing ppl & evil plots. They are not even ppl – they are monsters w/names." Two weeks before the murders, Defendant sent herself an email that contained the following links: "Can God Forgive a Murderer?, Christian News" and "billy graham-questions about forgiveness & murder – AOL Search Results." Then, on the night before the murders, Defendant invited Jamie to the Potter residence, and Buddy asked Jamie to "do him a favor."

- 53 -

Finally, the State presented evidence that Defendant attempted to destroy evidence relating to the offenses and provide Buddy with a false alibi after he carried out the murders. As investigators were executing a search warrant at the Potter residence, Defendant tore up emails, which contained photographs of Victim Hayworth and referred to her as a "whore." Then, when Buddy called Defendant after his confession to investigators, Defendant instructed Buddy to say that he was at home with her at the time of the murders, although this story conflicted with Jenelle's text messages to Jamie the morning of the murders, in which Jenelle told Jamie that Buddy had just left the house. Defendant's assertion that she saw Buddy "sittin' there" at home at the time of the murders was also contradicted by Jamie's testimony that Buddy picked him up that morning, drove them to the church parking lot near the victims' residence, and killed the victims.

Defendant does not challenge the authenticity of the emails and social media posts as it relates to their admissibility in this case. However, to the extent Defendant claims the State failed to prove identity because it did not establish that Defendant "in fact [] wrote the particular emails[,]" we conclude that the jury could reasonably infer from circumstantial evidence presented at trial that Defendant was the author of the emails sent from her email account. The emails were initiated from Defendant's email account, and most were signed with Defendant's name (or some form thereof). The writing in the emails contained many of the unique characteristics of Defendant's known writing samples, as identified by Agent Lott. Additionally, the State submitted records from Century Link showing the IP addresses associated with the Potter residence on each day of the relevant time period. The jury could compare these records to the IP addresses listed on the emails and conclude that the emails were sent from the computer in the Potter residence. The content of the emails also supports a conclusion that Defendant was the author. In many of the emails, Defendant shared personal information about her family, her struggles with Ms. Groover, her initial disdain for Jamie, her hatred for the victims and their friends, and her concern over Jenelle's health and well-being. To the extent that Defendant suggests that the State was required to affirmatively prove that Defendant was the author of the emails, such a challenge goes to the weight of the evidence, not its admissibility. *See State v. Vermaine M. Burns*, No. M2014-00357-CCA-R3-CD, 2015 WL 2105543, at *12 (Tenn. Crim. App. May 5, 2015) (citing *Tienda v. State*, 358 S.W.3d 633, 646 (Tex. Crim. App. 2012); *Commonwealth v. Purdy*, 945 N.E.2d 372, 381-82 (Mass. 2011); *People v. Clevenstine*, 891 N.Y.S.2d 511, 514 (N.Y. App. Div. 2009)), *no perm. app. filed.*

In her brief, Defendant states that she "[u]ltimately . . . challenges the weight and credibility of the evidence" as it relates to her convictions for first degree premeditated murder. However, the weight and credibility given to the testimony of witnesses, as well

as the reconciliation of conflicts in that testimony, are the province of the jury, and this court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659. Affording the State "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom," *Vasques*, 221 S.W.3d at 521, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Defendant, acting with the intent to promote the commission of the offenses, solicited, directed, aided, or attempted to aid Buddy and Jamie in the commission of the murders. The evidence is sufficient to support Defendant's convictions for two counts of first degree premeditated murder under a theory of criminal responsibility.

### 2. Conspiracy to commit first degree murder

As relevant here:

> The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

Tenn. Code Ann. § 39-12-103(a) (2012). The State must prove that "an overt act in pursuance of the conspiracy . . . [was] done by the person or by another with whom the person conspired." Tenn. Code Ann. § 39-12-103(d) (2012). It is not a defense "that the offense that was the object of the conspiracy was not committed." Tenn. Code Ann. § 39-12-103(f) (2012). The underlying offense of the conspiracy at issue here was first degree murder, which is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2012).

Additionally:

> If a person guilty of conspiracy . . . knows that another with whom the person conspires to commit an offense has conspired with one (1) or more other people to commit the same offense, the person is guilty of conspiring with the other person or persons, whether or not their identity is known, to commit the offense.

Tenn. Code Ann. § 39-12-103(b) (2012). "To prove a conspiracy, it is not necessary that the State show a formal agreement between the parties to do the unlawful act, but a mutual implied understanding is sufficient, although not manifested by any formal words, or by a written agreement." *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). "[T]he essence of the offense of conspiracy is an agreement to accomplish a

criminal or unlawful act[.]" *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise." *Randolph,* 570 S.W.2d at 871.

On appeal, Defendant contends that the evidence is insufficient to support her conviction because, according to Jamie's testimony, there was no agreement to kill the victims, and his testimony failed to link Defendant to the murders "in any significant way." However, viewing the evidence in the light most favorable to the State, we conclude that sufficient evidence exists showing a mutual implied understanding among Defendant, Jamie, and Jenelle (acting under the guise of "Chris") that the victims would be killed. Numerous emails among Jenelle, writing as "Chris," Defendant, and Jamie included references of their intent to kill the victims. In an email to Defendant in April 2011, "Chris" said that he would kill Ms. Thomas "and [Victim Payne] then [Victim Hayworth] for sure." In a shredded email recovered by the TBI, Defendant wrote to "Chris" that Victim Hayworth "***need[ed] to die!***" In an October 2011 email to Jamie, "Chris" wrote:

> **With you and Buddy I hope you all can get them. I hope it all works out great. I hope that you will pray about it and Buddy is and that you know what you are all doing is great. Your going to help the town.) wish i could kill them but right now i really can't.**

Then, in December 2011, Defendant wrote to "Chris" that Buddy was "**trying to be patient for the 'right time' but now, he says the Time is Has Come**-whenever now! - and If they want Jen so bad they can't stand it, then come on! and **they will breathe their last breath..bud is soooo ready, we all are**." Defendant told "Chris," "we are ready to take care of this ourselves, espec. Bud and Jamie are super ready all the time." Additionally, two weeks before the murders, Defendant sent herself an email linking to articles about whether God would forgive murders.

The evidence further shows that Jamie joined in Defendant's and Jenelle's plan to kill the victims. Following the death of his mother, Defendant brought Jamie into the fold of the Potter family and involved him in the family's dispute with the victims. Defendant "would bring [Jamie] up to speed on who was emailing what, or . . . what all the bad things that they'd said about Jenelle. And that ["]Chris["] was angry and that . . . ["Chris"] was firing back with emails and it was like a war." Eventually, Defendant told Jamie that the victims were also targeting him in their campaign of harassment and threats. At the same time, Jenelle sent emails to Jamie from "Chris," in which "Chris" would "rant and rave" about the victims and wish harm on them. In the emails, "Chris" also coached Jamie on how to treat Jenelle and win over Defendant and Buddy. Jamie testified that he was in love with Jenelle and sought the approval of Defendant and

- 56 -

Buddy.  As Jenelle's boyfriend, Jamie shared Defendant's and Buddy's motive of protecting Jenelle.  Jamie was included in family meetings, during which Defendant and Buddy would discuss the situation with the victims and what to do about it.  Defendant also told Jamie that he could not trust Victim Payne and that Victim Payne had told people that Jamie was a "bad person."  In an email sent from Jamie to Defendant a month before the murders, Jamie wrote that he hoped the victims would "get whats coming to them."

Additionally, the State presented evidence that Defendant, Jenelle, and Jamie acted for the purpose of promoting or facilitating the commission of the murders and that Jamie committed several overt acts in furtherance of the conspiracy.  Writing as "Chris," Jenelle informed Defendant of the danger posed by the victims and their friends.  Defendant said in emails to "Chris" that she passed along information from "Chris" to Buddy so that Buddy could "take action as needed[.]"  Initially, Defendant attempted to have "Chris" and Buddy meet so that Buddy could receive his CIA ID, and she conveyed to "Chris" that Buddy "**has thought and thought of ways & is ready . . . just needs another guy.**"  After Jenelle claimed that "Chris" had developed various health problems, Defendant began communicating with Jamie by phone and inviting Jamie to the Potter residence so that Buddy could talk to him.  Jenelle also encouraged a meeting between Jamie and Buddy in a Facebook message exchange between "Chris" and Defendant.  In an email from December 2011, Defendant wrote that they were "ready to take care of this ourselves . . . ."  In the same email, Defendant admitted telling Jamie and Buddy that "their backs are covered" due to the CIA involvement.  On the evening before the murders, Defendant called Jamie and invited him to the Potter residence, and while there, Buddy asked Jamie to "do him a favor."  Early the next morning, Jenelle sent Jamie multiple text messages, instructing him to call Buddy and letting Jamie know that Buddy was on the way to his house.  Jenelle also coached Jamie not to take his cell phone with him and repeatedly professed her love for him.  Jamie agreed to help Buddy, and he waited with Buddy at the church parking lot until Paw Bill left the victims' residence.  Buddy's intentions became clear when he handed Jamie a gun and told him to keep watch at the back door.  Jamie went along with this plan.  Although he never fired his weapon, he helped Buddy locate Victim Hayworth after Victim Payne had been shot.  This evidence supports a rational inference that Jamie joined in Defendant's and Jenelle's plan to have Buddy kill the victims, and he committed several overt acts as a co-conspirator in furtherance of that plan.  The evidence is sufficient to support the jury's determination that Defendant conspired with Jenelle and Jamie to commit first degree premeditated murder.

### 3. Tampering with evidence

Defendant next challenges the sufficiency of the evidence as it relates to her conviction for tampering with evidence, arguing that the photographs she tore up had not been noticed by investigators and that because the photographs did not contain either victim, they "had little, if anything to do with this case."

Tennessee Code Annotated section 39-16-503(a)(1) defines the offense of tampering with evidence as follows:

> (a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to:
>
> > (1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding . . . .

Tenn. Code Ann. § 39-16-503(a)(1) (2012).

This statute requires the State to prove three elements beyond a reasonable doubt—"timing, action, and intent." *State v. Hawkins*, 406 S.W.3d 121, 132 (Tenn. 2013) (quoting *State v. Gonzales*, 2 P.3d 954, 957 (Utah Ct. App. 2000)). "The 'timing' element requires that the act be done only after the defendant forms a belief that an investigation or proceeding 'is pending or in progress.'" *Id.*; *see State v. Smith*, 436 S.W.3d 751, 763 (Tenn. 2014). "The 'action' element requires alteration, destruction, or concealment." *Hawkins*, 406 S.W.3d at 132. Here, the State's case against Defendant was premised on Defendant's "altering" of photographs collected by officers during the execution of the search warrant at Defendant's residence. To "alter" a thing means "to make different without changing into something else." *Id.* (quoting *State v. Majors*, 318 S.W.3d 850, 859 (Tenn. 2010)). To establish the "intent" element, the proof must show that the defendant intended for his actions "to hinder the investigation or official proceeding by impairing the record's, document's, or thing's 'verity, legibility, or availability as evidence.'" *Id.* (quoting Tenn. Code Ann. § 39-16-503(a)(1)). Tampering with evidence is a "specific intent" crime. *Id.* (citing *State v. Jackson*, 237 P.3d 754, 758 (N.M. 2010); 3 *American Law Institute, Model Penal Code and Commentaries* § 241.7 at 180 (1962)). Accordingly, the State was required to prove beyond a reasonable doubt that when Defendant tore up the photographs, she intended to impair the photographs' verity, legibility, or availability as evidence in either the police investigation or her eventual trial. *See id.*

- 58 -

When viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's conviction for tampering with evidence. Chief Deputy Woodard testified that he and other investigators executed a search warrant at the Potter residence on February 7, 2012, after Buddy's arrest in connection with the victims' murders. During the execution of the search warrant, investigators had Defendant and Jenelle sit on a couch in the living room, where Chief Deputy Woodard was logging evidence brought to him from various parts of the house from by other investigators. Thus, Defendant clearly would have known that an investigation or proceeding was in progress at the time she tore up the photographs. Buddy had been arrested, and multiple investigators were inside the Potter residence executing a search warrant. Additionally, Defendant altered evidence by tearing up photographs that had been collected by investigators. Chief Deputy Woodard testified that Investigator McCloud placed a stack of papers to be logged on a chair in the living room beside Chief Deputy Woodard. Chief Deputy Woodard then saw Defendant reach over, pick up the stack of papers, and begin ripping them up. Although Defendant contends that she did not intend for her actions to hinder the investigation, Chief Deputy Woodard testified that, when he instructed Defendant to "give [him] those papers," he observed that the stack of papers consisted of emails which contained photographs of Ms. Potter, Ms. Thomas, and Victim Hayworth. One of the torn emails in particular indicated hostility towards Victim Hayworth. The email's subject line read, "Billie whore" and contained a photograph of only Victim Hayworth. Under these circumstances, we conclude that a rational juror could infer that Defendant intended to impair the photographs' verity, legibility, or availability as evidence in either the police investigation or at trial and that the evidence is sufficient to support her conviction for tampering with evidence. Defendant is not entitled to relief on this issue.

### E. Motion to sever

Defendant contends that the trial court improperly denied her motion to sever her case from Jenelle's. Defendant asserts that "a joint trial in this situation [was] highly prejudicial" due to Defendant's reluctance to testify against her co-defendant daughter, and Defendant encourages this court to recognize the parent-child privilege. The State responds that any issue about the denial of a motion to sever co-defendants is waived due to Defendant's failure to raise the issue in her motion for new trial. Moreover, the State asserts that Defendant has not met her burden to show that plain error relief is warranted. We agree with the State.

Defendant did not raise this issue in the motion or in an amended motion for new trial. By failing to include this issue in her motion for new trial, Defendant has waived plenary review of the issue. *See* Tenn. R. App. P. 3(e), 36(a).

Moreover, Defendant is not entitled to plain error relief because the record does not clearly establish what occurred in the trial court. *Adkisson*, 899 S.W.2d at 640-41. As noted by the State, the record on appeal does not contain Defendant's motion to sever, a transcript of the hearing on the motion, or the trial court's order disposing of the motion. Without a proper record, we are unable to determine that a clear and unequivocal rule of law was breached or that consideration of the issue is necessary to do substantial justice. In her brief, Defendant acknowledges that Tennessee does not recognize a parent-child privilege; therefore, any failure of the trial court to allow Defendant to testify and claim such a privilege could not be considered a breach of a clear and unequivocal rule of law. Finally, we note that, Defendant stated during a *Momon* hearing that she had decided not to testify on her own behalf after consultation with counsel. Defendant did not suggest that her decision not to testify was impacted by being tried jointly with her daughter. Plain error relief is not warranted on this issue.

## F. Denial of the petition for writ of error coram nobis

Defendant filed her notice of appeal in this case in November 2015. Thereafter, in February 2016, the lead prosecutor, General Brooks, published a book on the case entitled, "Too Pretty to Live: the Catfishing Murders of East Tennessee." In June 2016, Defendant filed a motion to supplement the appellate record with the prosecutor's book and with four typewritten statements from Jamie Curd dated February 2, 2012, February 6, 2012, February 7, 2012, and April 16, 2015. On June 22, 2016, this court denied the motion, finding that the items were not properly includable in the record as they were not submitted for the trial court's consideration at the motion for new trial hearing. Defendant then filed her appellate brief on July 12, 2016, along with a motion to stay the appeal so that she could purse a petition for writ of error coram nobis, which she had filed with the trial court on July 7, 2016. On July 13, 2016, this court entered an order staying the direct appeal.

On February 7, 2018, this court received an order from the trial court denying the petition for writ of error coram nobis. Accordingly, on February 9, 2018, we entered an order vacating the stay. In the order, this court instructed Defendant to "file an appropriate motion to supplement the appellate record with all items relevant to the petition for writ of error coram nobis" and to "seek leave to file a supplemental brief in order to ensure full consideration of this matter on appeal." Defendant did not file a motion to supplement the record and did not file a supplemental brief. Additionally, when the State asserted in its brief that this issue was waived due to an inadequate record, Defendant filed no reply brief or motion to supplement.

In her brief, Defendant raises a claim that she is entitled to a new trial based on the issues raised in her petition for writ of error coram nobis. The State responds that the issue is waived. We agree with the State.

The defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g.*, *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *see* Tenn. R. App. P. 24(b). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)).

Defendant did not file a motion to supplement the direct appeal record with the record of the coram nobis proceedings as instructed by this court or in response to the State's claim of waiver. As a result, the record does not contain the petition for writ of error coram nobis. Additionally, the record contains no transcript of the petition for writ of error coram nobis hearing and no exhibits from the hearing (which presumably included the prosecutor's book). Without the book in the record, it is impossible to assess whether it carries the prejudicial potential Defendant asserts. Accordingly, Defendant has waived any issue relating to the trial court's denial of the petition for writ of error coram nobis based on the incomplete record.

We further conclude that Defendant has waived this issue under Tennessee Court of Criminal Appeals Rule 10(b), which states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." In her brief, Defendant contends that "there are issues raised within the Petition that justif[y] a Stay of this Appeal as well as granting the [Defendant] a new trial." Defendant makes no argument as to why specific issues raised in the coram nobis petition entitle her to a new trial. Defendant does not cite to any case law, rules, or statutes that address coram nobis relief in the argument portion of her brief, and she did not file a supplemental brief addressing the issue. Accordingly, the claims raised in the petition for writ of error coram nobis are waived under Rule 10(b) as well.

## G. Merger of conspiracy conviction

The State argues that the trial court improperly merged Defendant's conspiracy conviction into her convictions for first degree premeditated murder and failed to impose a sentence for that conviction. The State asserts that, pursuant to Tennessee Code Annotated section 39-12-106(c), upon a conviction for conspiracy and the offense which

was the object of the conspiracy, the two offenses are not merged.  Defendant did not file a reply brief addressing the State's contention.  We agree with the State.  Tennessee Code Annotated section 39-12-106(c) provides that "[a] person may be convicted of conspiracy and the offense which was the object of the conspiracy."  Tenn. Code Ann. § 39-12-106 (2015), Sentencing Comm'n Cmts (stating that "the conspiracy is not merged with the completed offense and, therefore, the offender may be convicted of both the conspiracy and the object offense"); *see also State v. Watson*, 227 S.W.3d 622, 628 (Tenn. Crim. App. 2006).  Accordingly, we reinstate Defendant's conviction for conspiracy to commit first degree murder and remand to the trial court for sentencing on that count.  *See, e.g.*, *State v. Webster*, 81 S.W.3d 244, 252 (Tenn. Crim. App. 2002).

### III. Conclusion

For the aforementioned reasons, the judgments of conviction for tampering with evidence and two counts of first degree premeditated murder are affirmed.  The judgment of conviction for conspiracy to commit first degree murder is reinstated and remanded to the trial court for sentencing.

_____
ROBERT L. HOLLOWAY, JR., JUDGE